**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TEMPUS AI, INC. <br><br> Plaintiff, <br><br> v. <br><br> SEAN BEYER, an individual, and CYDNEY PADEN, an individual, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) Civil Action No.   24-cv-8592 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**VERIFIED COMPLAINT**

Plaintiff Tempus AI, Inc. ("Tempus") for its Verified Complaint against Defendants Sean Beyer ("Beyer") and Cydney Paden ("Paden," together with Beyer, the "Defendants"), states as follows:

**INTRODUCTION**

1.      This case concerns two of Tempus's former employees who joined a direct competitor after secretly exfiltrating Tempus's highly confidential and competitively sensitive documents and misrepresenting their post-resignation plans to Tempus.

2.      Within days of announcing their resignations from Tempus, Defendants Beyer and Paden engaged in what appears to be a calculated and concerted effort to take Tempus's confidential information and to use it to benefit their new employer, Guardant Health, Inc. ("Guardant"). Before leaving Tempus, Defendants exported, in some capacity, nearly thirty distinct Tempus files containing highly confidential and proprietary customer information.

3.      For his part, Beyer emailed proprietary information from his Tempus email address to a personal one and uploaded other documents to an unknown destination via a Google Chrome

browser. Paden behaved similarly. She used her Tempus computer to upload documents (and in one case the same highly confidential spreadsheet that Beyer took) from a Google Chrome browser to an unknown web destination.

4. Both then joined Guardant in roles where they are poised to target the exact same customers with whom they worked at Tempus, in the exact same territory, using Tempus's own information and causing Tempus irreparable harm.

## PARTIES

5. Tempus AI, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. For jurisdiction purposes, Tempus is a citizen of Illinois and Delaware.

6. Sean Beyer is a former Tempus employee who resides in Arizona. For jurisdiction purposes, Beyer is a citizen of Arizona.

7. Cydney Paden is a former Tempus employee who resides in Colorado. For jurisdiction purposes, Paden is a citizen of Colorado.

## JURISDICTION AND VENUE

8. Jurisdiction is proper in this district pursuant to 28 U.S.C. § 1331.

9. There is federal question jurisdiction under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*

10. There is also diversity jurisdiction based on the diversity of the citizenship of the parties with an amount in controversy exceeding $75,000, consistent with 28 U.S.C. § 1332. This Court also has supplemental jurisdiction over the state law causes of action under 28 U.S.C. § 1367(a) because the claims at issue are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

11. Venue is proper in this District under 28 U.S.C. § 1391(b), as a substantial part of

the events giving rise to the claims asserted herein occurred in this District. Both Defendants' relevant Agreements are governed by Illinois law.

## GENERAL ALLEGATIONS

**Tempus's Business**

12. Tempus, a healthcare technology company, was founded in Chicago in 2015. In the relatively short amount of time it has existed, Tempus has revolutionized medical care by combining next-generation sequencing, real-world data, technology, and artificial intelligence.

13. Tempus has developed a portfolio of tools that transform healthcare data into actionable insights for physicians, academic researchers, and life-sciences companies. Driven by data and real-world evidence, Tempus helps make precision medicine a reality.

14. While its business is multifaceted in this respect, its two main business product lines are: (1) its genomic sequencing testing and related genetic testing operations (collectively referred to as the "Genomic Sequencing business"); and (2) its data licensing business (the "Data business").

15. Under its Genomic Sequencing business, Tempus provides next-generation sequencing ("NGS") and analyzes patients' DNA and RNA data to help identify potential treatment options based on patients' unique genomic makeup, primarily for oncology patients. Tempus currently offers NGS tests in oncology, neuropsychology, and other disease states. Tempus's tests are used for both clinical and research purposes.

16. Tempus's sales teams are responsible for growing, developing, and retaining its NGS testing customer base in their assigned territories. Tempus's primary customers include health systems, oncology practices, cancer centers and clinics, and independent physicians.

17. Through its Data business, Tempus leverages the de-identified, multi-modal

3

datasets it collects and maintains through its Genomic Sequencing business, healthcare providers, and other sources, to enable physicians to make data-driven treatment decisions, to accelerate research, drug discovery, and development, and to drive innovations in precision medicine. Tempus has built a proprietary technology platform that aggregates, abstracts, structures, and de-identifies data to facilitate the deployment of AI at scale.

18. Given the relatively small number of companies that operate in the same space as Tempus, competition is fierce. Companies like Tempus operate in a nascent industry, where options are limited and prospective customer spend is finite. Tempus has been able to gain a competitive edge through massive investment, its extensive and targeted training of its employees, its strategic and thorough monitoring and planning of operations, its commitment to and development of customer relationships and understanding of customer goals and needs, its ongoing and continuing development of cutting-edge technology, and its deployment of data in improving patient outcomes.

19. Tempus has raised more than $1.5 billion, which it has invested in substantial research and development efforts. Tempus consummated an Initial Public Offering in June of this year.

20. Tempus has invested extensive and substantial resources, time, and expense in developing its trade secrets and in ensuring that its reputation and relationships with customers and other business contacts remain pristine.

21. A key component of this pursuit are individuals, like Beyer and Paden, who have access to Tempus's confidential information and trade secrets and who are tasked with growing, developing, and retaining Tempus's customer relationships, collaborations, and partnerships.

**Tempus Protects Its Confidential, Proprietary and Trade Secret Information**

22.     Tempus takes extensive measures to protect its confidential information and trade secrets. As a matter of course, it requires its employees to sign non-disclosure and confidentiality agreements. Tempus also limits access to its confidential information and trade secrets to certain levels of employees, depending on their duties and responsibilities.

23.     Tempus utilizes multiple security systems to protect this information. All of Tempus's information is password-protected and requires two-factor authentication. In addition, Tempus leverages numerous third-party software systems to protect the integrity of its proprietary systems and data. By way of example only, Tempus utilizes Okta (which manages all user accounts and authentication), Crowdstrike (which monitors endpoint security for potential breaches), Endpoint Protector (which monitors endpoint devices for unauthorized transfer of information), WorkspaceOne (which manages all endpoint device settings to prohibit unauthorized usage), and Tanium (which provides advanced threat detection and response capabilities for endpoints).

24.     Tempus requires employees to attend trainings and affirm their commitment to Tempus's code of conduct and other core non-disclosure policies. For example, Tempus's Employee Handbook and Code of Conduct, which Defendants acknowledged and agreed to abide by, contain numerous provisions related to exposure to and protection of Tempus's Confidential Information (as defined therein).

**Beyer's Employment With Tempus**

25.     Tempus hired Beyer on or around November 7, 2022 as a Clinical Account Executive ("CAE"), servicing its sales territories in Arizona, New Mexico, and parts of Texas. A CAE is a customer-facing sales and servicing role. Beyer was a member of the West Clinical Sales – Mountain Sales team.

26. Beyer's first date of employment was December 5, 2022.

27. Beyer was hired into a senior-level sales position and was primarily responsible for securing, retaining, and servicing customers and meeting sales objectives and goals. CAEs play a critical role in servicing the late-stage cancer patients who receive Tempus's comprehensive genomic profiling tests. CAEs are not only responsible for expanding the number of Tempus tests ordered within their assigned territories, but they are also responsible for ensuring everything runs smoothly once an order has been placed and for closely managing, developing, and growing their customer relationships.

28. Beyer also drove Tempus's strategic business expansion and collaboration and partnership opportunities with a number of customers and targets, including major cancer centers, clinics, and oncology practices in his territory, as well as key providers and academic medical centers in his territory.

29. As a CAE, Beyer was further responsible for developing and implementing a comprehensive business plan for his territory, which included strategic review of Tempus's initiatives, growth opportunities, current market weaknesses, and areas for tactical engagement.

30. And, of course, in a sales-oriented role, Beyer was required to analyze the competitive landscape to ensure Tempus stayed ahead of its competitors, like Guardant.

31. As a CAE, Beyer had access to and regularly worked with Tempus's confidential, proprietary, and trade secret information.

32. Specifically, Beyer has a deep understanding of Tempus's customers and targets in his territory, including confidential information regarding such customers' unique ordering habits, goals, priorities, and pressure points. Beyer had access to the most granular information about

Tempus's customers, including Tempus's largest and highest revenue-producing customers, and was the person responsible for managing each customer relationship in his territory.

33. Beyer accessed this information through Tempus's customer relationship management platform, Salesforce. Through Salesforce, Beyer had knowledge of customer and prospect identities, pricing structures, services provided, and feedback, among other information.

34. Beyer is also intimately familiar with Tempus's products, services, technology, and pricing, all of which would be critical information for a competitor.

35. Beyer had access to Tempus's Business Intelligence Platform, where Tempus collects and stores a variety of its confidential and proprietary information, including customer order and account information.

36. Beyer also had access to strategic forecasting and targeting information relating to his territory, including future targets, partnerships, and potential collaborations with various medical centers or other providers.

37. Beyer often visited and worked with employees located in Tempus's principal office in Chicago, Illinois. Tempus's Customer Success Team, whom Beyer worked with regularly on various customer accounts and orders, sits in Chicago. Further, almost all of Tempus's testing takes place in Chicago, and Beyer regularly interacted with Tempus's labs and related personnel in managing test orders and results for his customers.

**Beyer's Confidentiality and Protective Covenants Agreement with Tempus**

38. In early November 2022, in connection with Tempus's offer of employment to Beyer, Tempus presented Beyer with a copy of its Confidentiality, Intellectual Property and Protective Covenants Agreement (the "Beyer Agreement") for his consideration and execution.

39. Beyer executed the Beyer Agreement on November 7, 2022. *See* Exhibit A.

40. In exchange for executing the Beyer Agreement, Tempus hired Beyer. Beyer also received a grant of Restricted Stock Units ("RSUs") upon his hiring and in exchange for signing the Beyer Agreement.

41. In pertinent part, the confidentiality and non-disclosure provisions of the Beyer Agreement provide:

> a. *Confidential and Proprietary Information*. Your job requires you to be exposed to confidential or proprietary information ["CPI"] of Tempus, its subsidiaries, and other third parties, including technical and commercial information related to Tempus, its customers', or its prospective customers' business that is not generally known to the public. CPI includes, among other things, all patent applications, trade secrets, and other intellectual and tangible property rights in all Innovations. CPI also includes proprietary or confidential information of any other third party who may disclose such information to Tempus or to you under any obligation of confidentiality in the course of Tempus's business, including protected health information and personal data protected by applicable law. CPI is valuable to Tempus and the core of our business. Employees who will be exposed to CPI must sign an agreement before joining our team to protect CPI.
>
> b. *Ownership of and Obligations Regarding Innovations*.
>
> . . .
>
> v. You agree to keep all CPI that you encounter in strict confidence, even after you leave Tempus. You cannot use CPI for your own purposes, you cannot take CPI with you if you leave (in fact, you are required to give it back or destroy it), and you cannot disclose CPI to any third party unless required to do so as part of your job at Tempus, or because of a legitimate law enforcement demand.

Exhibit A, ¶ 2(a)-(b).

42. As it relates to non-solicitation and non-interference of customers, the Beyer Agreement provides:

> c. *Non-Interference/No-Hire*. For the same reasons you cannot compete directly with Tempus after you leave, you cannot solicit or interfere with Tempus's employees, customers, or prospective customers. Specifically, <u>for 12 months after you leave Tempus,</u> you agree not to:
>
> . . .

iii. directly or indirectly solicit or encourage, attempt to solicit or encourage, or divert business away from any Tempus customer, prospective customer, or any entity or person with whom Tempus has a business relationship, (i) that you had business contact with during the last 12 months of your employment, or (ii) about whom you acquired CPI during the last 12 months of your employment with Tempus, to stop doing business with Tempus, or otherwise interfere in any way with Tempus's relationship with such entity or person.

Exhibit A, ¶ 3(c).

43.     The Beyer Agreement also contains a non-compete provision.[1] Exhibit A, ¶ 3(a).

44.     Beyer acknowledged that the terms of the Beyer Agreement were reasonable. *See* Exhibit A, ¶ 3.

45.     Beyer also acknowledged Tempus is entitled to injunctive relief and attorneys' fees and costs should he breach the Beyer Agreement. *See* Exhibit A, ¶ 4(b).

46.     The Beyer Agreement also provides that in the event Beyer breaches any provision of the Agreement, the term thereof will be tolled until such breach is cured. *Id*.

47.     The Beyer Agreement is governed by Illinois law. *See* Exhibit A, ¶ 4(c).

48.     In reliance on Beyer's affirmations in the Beyer Agreement, Tempus provided Beyer with access to its confidential, proprietary, and trade secret information.

49.     Beyer acknowledged that the information he had access to is confidential and proprietary, and that Tempus's goodwill and the customer relationships Beyer enjoyed while employed at Tempus are significant and valuable to Tempus.

**Paden's Employment with Tempus**

50.     Paden joined Tempus in May 2019 as a Clinical Account Associate ("CAA") in Dallas, Texas. Paden's first date of employment was June 3, 2019. Paden relocated to Colorado in

---

[1] Tempus is not seeking to enforce the Non-Compete provision of the Beyer Agreement and prevent Beyer from continuing in his current employment with Guardant. However, Tempus reserves its right to enforce this provision and is not waiving any rights available to it under the Beyer Agreement.

March 2023 with Tempus's relocation assistance.

51.     As a CAA, Paden served in a sales-support role, and supported Tempus's CAEs, including Beyer. The CAA role is customer-facing and requires regular interaction with Tempus's customers. Paden and Beyer both worked on the same sales team: West Clinical Sales – Mountain Sales.

52.     Paden supported Beyer and other CAEs in managing day-to-day customer issues and ensuring physicians' orders were on track, timely, and receiving the appropriate care and follow-up to ensure Tempus met its customer deliverables. Paden additionally sold Tempus's activities, including longitudinal and algorithmic tests, to customers. Paden interacted with Tempus's customers directly and built her own relationships with such customers.

53.     This role is critical to ensuring customer satisfaction and ensures CAEs are able to devote their time and resources to expanding Tempus's business, increasing Tempus's presence and revenue in the marketplace.

54.     Paden is intimately familiar with Tempus's products and services, but, more importantly, its customer base in her territory, including Tempus's largest and highest revenue-producing customers. Through Salesforce and other Tempus systems, including its Business Intelligence Platform, Paden had access to and regularly utilized detailed confidential information related to Tempus's customers, including names, contact information, specialties, and specifics concerning their relationships with Tempus. Like Beyer, Paden understands Tempus's customers' preferences, ordering history, and priorities. This information is invaluable to a competitor.

55.     Paden also had access to Tempus's Business Intelligence Platform.

56.     Tempus promoted Paden to Senior Clinical Account Associate in January 2021, and she held this role until she resigned in July 2024. In this role, she maintained the same access

and exposure to Tempus's confidential and proprietary information as she had as a CAA.

57.     Like Beyer, Paden regularly visited and worked with employees located in Tempus's Chicago, Illinois principal office. She worked closely with the Customer Success Team seated in Chicago and was responsible for managing customers' orders, tests, and results, which all come out of the Chicago office.

**Paden's Confidentiality and Restrictive Covenants Agreement with Tempus**

58.     In May 2019, in connection with Tempus's offer of employment to Paden for the CAA role, Tempus presented Paden with a copy of its Confidentiality, Intellectual Property and Restrictive Covenants (the "Paden Agreement") for her consideration and execution.

59.     Paden executed the Paden Agreement on May 14, 2019. *See* Exhibit B. In exchange for Paden's execution of the Paden Agreement, Tempus hired and employed Paden.

60.     In pertinent part, the confidentiality and non-disclosure provisions of the Paden Agreement provide:

> 1. Proprietary Information. My employment status creates a relationship of confidence and trust between Tempus and me with respect to any information that is not generally known to the public or is otherwise treated by Tempus as confidential or proprietary and is: (a) applicable to the business of Tempus or its subsidiaries; or (b) applicable to the business of any client or customer of Tempus or its subsidiaries, which may be made known to me by Tempus or by any client or customer of Tempus or its subsidiaries, or learned by me in such context during the period of my employment.
>
> All such information has commercial value in the business in which Tempus is engaged and is hereinafter called "Proprietary Information." By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and formulae related to the current, future and proposed products and services of Tempus or its subsidiaries, and including, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering,

11

financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales and merchandising and marketing plans and information. "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Tempus or to me under any obligation of confidentiality in the course of Tempus's business.

2. Ownership and Confidentiality of Proprietary Information.

(a) All Proprietary Information is the sole property of Tempus, Tempus's assigns, and Tempus's customers, and Tempus, Tempus's assigns and Tempus's customers shall be the sole and exclusive owner of all patents, copyrights, mask works, trade secrets and other rights in the Proprietary Information. . . .

(b) At all times, both during my employment by Tempus and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and, except as necessary to meet Tempus's business needs, I will not: (i) use any Proprietary Information; (ii) directly or indirectly permit a third party to obtain access to any Proprietary Information; or (iii) transmit or disclose any Proprietary Information to any person, concern or entity. Further, I shall not make use of any Proprietary Information, directly or indirectly, for myself or for others, including, without limitation, in connection with any other employment or consulting capacity. In the event I believe I must disclose or otherwise make available Proprietary Information to any third party in order to meet Tempus's business needs, I shall inform Tempus prior to any such disclosure in order that Tempus may enter into a confidentiality or similar agreement with such third party.

(c) All non-disclosure obligations of paragraph 2(b) above shall apply (i) as to Proprietary Information other than trade secrets, at all times during my employment and for two (2) years after termination of such employment, and (ii) as to trade secrets, for as long as such trade secrets retain their status as a "trade secret" under applicable law.

Exhibit B, ¶ I.1.

61. The Paden Agreement provides the following as it relates to Nonsolicitation:

13. Nonsolicitation/No-Hire.

(a) I agree that during the Non-Compete period, I will not, other than on behalf of Tempus, directly or indirectly without the prior written consent of Tempus (i) induce or attempt to induce any merchant, customer, supplier, licensee, or business relation of Tempus to cease doing business with Tempus, or in any way interfere with the relationship between Tempus and any merchant, customer, supplier, licensee, or business relation of Tempus or (ii) solicit or participate in soliciting the

> business of any then-current or prospective merchant or customer which was a merchant or customer of Tempus within one year prior to such solicitation, to purchase products or services similar to, or competitive with, the products or services then offered by Tempus, if I had direct contact with the merchant or customer or any confidential information related to such products or services during the 12 months preceding the termination of my employment or relationship with Tempus . . .

Exhibit B, ¶ II.13. The "Non-Compete period" lasts for eighteen months post-employment. *See* Exhibit B, ¶ II.12.

62. The Paden Agreement also contains a Non-Compete provision.[2] *See* Exhibit B, ¶ II.12.

63. Paden acknowledged that the terms of the Paden Agreement were reasonable. *See* Exbibit B, ¶ II.14.

64. Paden further acknowledged Tempus is entitled to injunctive relief and attorneys' fees and costs should she breach the Paden Agreement. *See* Exhibit B, ¶ III.18.

65. The Paden Agreement is governed by Illinois law, and Paden irrevocably consented to the exclusive personal and subject matter jurisdiction of the federal and state courts located in Illinois, as applicable, for any matter arising out of or relating to the Paden Agreement. *See* Exhibit B, ¶ III.22.

66. In reliance on Paden's affirmations in the Paden Agreement, Tempus provided Paden with access to its confidential, proprietary and trade secret information. Paden acknowledged that the information she had access to is confidential and proprietary, and that Tempus's goodwill and the customer relationships Paden enjoyed while employed at Tempus are significant and valuable to Tempus.

---

[2] Tempus is not seeking to enforce the Non-Compete provision of the Paden Agreement and prevent Paden from continuing in her current employment with Guardant. However, Tempus reserves its right to enforce this provision and is not waiving any rights available to it under the Paden Agreement.

**Beyer's Improper Conduct Before and After His Resignation**

67.     Beyer tendered his resignation to Tempus via email on July 30, 2024.

68.     At the time of his resignation, Beyer gave the impression he was joining a pharmaceutical company.

69.     Beyer did not disclose that he was joining Guardant, a direct competitor, when he resigned from Tempus.

70.     On August 2, 2024, three days after submitting his resignation, Beyer sent two emails from his Tempus email address to his personal non-Tempus email address – drsbeyer@yahoo.com. Each attached a file. The attachments were Excel spreadsheets with the following file names: (1) "Tumor Types with Corresponding Genes and Syndromes [INTERNAL USE ONLY];" and (2) "Cyd Tracking Sheets."[3]

71.     The Tempus file titled "Cyd Tracking Sheets" contains a significant amount of Tempus's proprietary and highly confidential information, including lists of institutions and healthcare providers who order Tempus's products and tests (in addition to a history of their ordering activity), a list of healthcare providers' contact information, the healthcare providers' ordering preferences, and unique attributes about the healthcare providers' ordering habits, among other proprietary information.

72.     Similarly, the file titled "Tumor Types with Corresponding Genes and Syndromes [INTERNAL USE ONLY]" is a compilation of Tempus-collected data and research related to various cancers, gene panels, and clinical review notes, which could be easily transferred to a competitor engaged in similar work, such as Guardant. This file was also clearly labeled "INTERNAL USE ONLY," further reflecting its proprietary nature.

---

[3] The "Cyd" referenced in the title of this document refers to Defendant Cydney Paden.

73. The next day, Beyer affirmatively moved both emails and their attachments from the "Sent" folder of his Tempus email account to the "Trash" folder.

74. On August 7, 2024, only three business days before his last day of employment on August 12, 2024, Beyer uploaded four Tempus files via the Google Chrome Browser on his Tempus laptop to an unknown destination.

75. These files each contain proprietary and confidential healthcare provider ordering information belonging to Tempus.

76. Beyer had no legitimate business purpose to export or upload these files to an unknown web destination, especially mere days before his last date of employment.

77. Beyer also exported and printed additional files in the three weeks before he tendered his resignation to Tempus, including an Excel and PDF file titled "Orders By Physician" and another PDF file titled "Orders by Hierarchy_Account." Hierarchy Account refers to how Tempus organizes customer information within Salesforce. Beyer did not have a legitimate business purpose to export or print these files during this timeframe, particularly given his imminent resignation.

78. Each of these documents are highly valuable to a competitor because they contain provider and physician ordering information and data that Tempus has collected over years of its relationships with these entities and/or individuals. These documents provide the level of detail a competitor needs to gain an advantage over a competitor like Tempus and expand its own market share.

79. The "Cyd Tracking Sheet," in particular, gives Beyer a significant edge in undercutting Tempus's customer and business relationships. Not only does this file detail Tempus's current offerings and orders with various healthcare providers and institutions, but it

also contains customers' historical orders with Tempus and the evolution of these relationships. This information is incredibly valuable to a Tempus competitor, as a competitor can use this customer-specific information to target Tempus's customers and provide the same services to the exact same customers.

80. To date, none of the files Beyer took from Tempus have been returned or recovered, and Beyer has not personally confirmed their deletion or destruction from his possession and/or access.

81. Beyer's conduct violates the Beyer Agreement's confidentiality and non-disclosure obligations.

82. Upon his departure, Beyer executed and returned Tempus's Departure Certification, which is a standard form Tempus issues to departing employees. In this Certification, Beyer represented he has or will "promptly return to Tempus all company property (whether in electronic or tangible form) in [his] possession" and that he "made a diligent search to locate such property and information." *See* Exhibit C.

83. Beyer also represented he would comply with the terms of the Beyer Agreement and acknowledged that any violations of the Beyer Agreement are subject to Tempus's rights and remedies under the Beyer Agreement and applicable law. *See* Exhibit C.

**Paden's Improper Conduct Before and After Her Resignation**

84. Paden tendered her resignation to Tempus on July 22, 2024, essentially a week before Beyer.

85. Paden told Tempus she intended to take time off and indicated she would not be immediately joining another company.

16

86. Between June 28, 2024 and July 22, 2024, Paden, like Beyer, used her Tempus laptop to export a number of Tempus files to unknown destinations via the Google Chrome Browser. These files included files titled "Add-On Orders [POI].csv," "Add-On Orders [POI].txt," "Add-On Orders [POI].csvf," "JS documents.pdf," and "pathology 2 (1).pdf."

87. The "Add-On Orders" files were exported from Tempus's internal Business Intelligence Platform and contain detailed information regarding various physicians' orders and other Tempus account information.

88. On July 22, 2024, the day she resigned, Paden uploaded an additional nine files via a Google Chrome Browser to an unknown destination.

89. Paden's export and upload activity continued until her last day of employment on July 31, 2024. Paden uploaded an additional ten files to an unknown destination via a Google Chrome Browser.

90. On July 31, 2024, Paden's last date of employment, she downloaded the Excel file "Cyd Tracking Sheets" from her Google Drive account. This is the same file Beyer emailed to his personal email account after his resignation. After downloading this file to a local computer, Paden then uploaded the "Cyd Tracking Sheets" spreadsheet to an unknown destination via a Google Chrome Browser.

91. Upon information and belief, Paden permanently cleared and deleted her Google Chrome Browser history on July 31, 2024, prior to returning her computer to Tempus.

92. Paden had no legitimate business purpose to export or upload these files to an unknown web destination. Paden's conduct violates the Paden Agreement's confidentiality and non-disclosure obligations.

93. Paden declined to sign Tempus's Departure Certification.

94.     To date, none of the files Paden took from Tempus have been returned or recovered, and Paden has not confirmed their deletion or destruction from her possession and/or access.

**Defendants' Employment with Guardant**

95.     Guardant is a direct competitor of Tempus.

96.     Like Tempus, Guardant is a precision medicine company, which is "redefining cancer care by driving a more personalized and data-driven approach that improves on traditional standards of care." And, per its website, Guardant is using "precision oncology" in "helping patients across all stages of the disease."[4]

97.     Both Guardant and Tempus collaborate with major cancer centers and clinics, oncology practices, and key providers across the United States to provide precision medicine and targeted therapies, particularly in oncology and late-stage cancer diagnoses.

98.     Guardant expressly identified Tempus as a primary competitor in its "liquid biopsy space for therapy selection," "minimal residual disease testing" business, and "within the broader genomics profiling space" in its 2023 Annual Report.[5]

99.     In its 2023 Annual Report, Guardant expressly identified its ability to "compete successfully with [its] competitors" as a risk to "sustain[ing] its profitability."[6]

100.    Guardant also specifically noted that some of its competitors, which includes Tempus, have "larger customer bases; greater brand recognition and market penetration," and are "able to respond more quickly to changes in customer requirements, devote greater resources to the development, promotion and sale of their tests," giving them an edge in the industry, higher

---

[4] https://guardanthealth.com/ (last accessed on September 15, 2024).
[5] https://s26.q4cdn.com/594050615/files/doc_financials/2023/ar/2023-Annual-Report.pdf, p. 11 (last accessed on September 15, 2024).
[6] *Id.*, pp. 30-31.

revenues, and higher profitability.[7]

101. As detailed in its Annual Report, Guardant is focused on growing its sales team in order to better address its customers' needs and increase its sales and revenue. Skilled, knowledgeable, and effective sales executives are critical to Guardant's business and future success.

102. Given that Tempus and Guardant compete for the same customers and market share, and that Guardant considers Tempus one of its primary competitors in numerous spaces, Guardant has engaged in an aggressive recruiting campaign of Tempus's sales employees in recent months.

103. Both Defendants are currently working for Guardant and, upon information and belief, working in roles substantially similar, if not identical, to those they held with Tempus in sales territories which overlap with their former Tempus territories. Neither Guardant nor Defendants have denied this.

104. Upon information and belief, Beyer recently gave a presentation to his new sales colleagues at Guardant regarding Tempus's products and services.

105. Neither Beyer nor Guardant has denied that Beyer gave such a presentation to Guardant's employees despite the opportunity to do so.

106. In early September 2024, immediately upon learning that Beyer and Paden were employed with Guardant in similar roles and that Beyer had given a presentation on Tempus's products and services to his Guardant colleagues, Tempus engaged in a forensic investigation to determine whether or not Beyer or Paden had engaged in any bad acts prior to their departure.

107. Tempus's forensic investigation uncovered Beyer's and Paden's breaches of their

---

[7] *Id.*

various confidentiality obligations as detailed in Paragraphs 70-80 and 86-90 *infra*, including exporting, uploading, and printing Tempus's proprietary and confidential information without authorization and without a legitimate business purpose to do so.

108. On September 9, 2024, Tempus promptly sent Guardant, Beyer, and Paden a letter via email and overnight mail detailing the findings of Tempus's forensic investigation and Tempus's serious concerns with the location and integrity of its confidential and proprietary information in light of Beyer's and Paden's actions and employment with Guardant.

109. In this letter, Tempus sought certain assurances from Beyer and Paden regarding the current location of the data, the reason for uploading, printing, and/or emailing of the data at issue, a full accounting of the current status of the data, and assurances that Beyer and Paden intended to comply with their confidentiality and non-disclosure obligations. Tempus also highlighted its concern with Beyer's recent presentation on Tempus's products and services to Guardant's employees, especially in light of the forensic investigation.

110. On September 12, 2024, Guardant sent Tempus a high-level response to the September 9 letter. The Guardant letter did not provide the assurances warranted under the circumstances. More significantly, neither Beyer nor Paden personally provided Tempus with a substantive response, nor did they provide any of the assurances sought by Tempus.

111. Guardant's letter conceded that Beyer emailed the Cyd Tracking Spreadsheet to his personal email account. Guardant's letter also conceded that the spreadsheet contained sensitive and proprietary information.

112. In contrast, Guardant's letter did not address, nor did it deny, whether Beyer and Paden are working in the same roles as they did at Guardant in their same territories, or whether Beyer gave a presentation detailing Tempus's products and services to Guardant employees.

113. On September 13, 2024, Tempus gave Beyer and Paden another opportunity to address Tempus's concerns and provide the information sought in an effort to de-escalate the situation. Beyer and Paden both referred to the letter Guardant had sent presumably on their behalf.

114. To date, Beyer and Paden have not provided any explanation regarding their actions pre- and post-resignation, to what location they uploaded Tempus's confidential and proprietary data (which included a significant amount of customer data) and for what purpose, where such information currently resides, and what they have done with such information since their respective departures.

115. Tempus's trade secrets and confidential and proprietary information are at risk of disclosure because Beyer and Paden have used, and will continue to use, this information to steal Tempus's customers and business.

116. Tempus's business in this highly specialized space, including its competitive edge, innovative products, and relationships with its customers and other partners, remains at significant risk due to Beyer's and Paden's breaches and misappropriation of Tempus's trade secrets and future (and inevitable) threatened misappropriation of such trade secrets.

117. Beyer's and Paden's actions will no doubt harm Tempus's relationships with its customers. This unfair competition will damage Tempus's goodwill, reputation, and competitive advantage.

118. Beyer's and Paden's actions have damaged and will continue to damage Tempus. Beyer and Paden must be enjoined.

**COUNT I**
**Breach of Contract – Against Beyer**
**(Injunctive Relief and Damages)**

119. Tempus realleges and incorporates by reference Paragraphs 1 through 118 as

though fully set forth herein.

120. The Beyer Agreement is a valid and enforceable contract.

121. In consideration for entering into the Beyer Agreement, Tempus hired Beyer and provided him access to its trade secrets and confidential and proprietary information.

122. Among other obligations in the Beyer Agreement, Beyer agreed to: (i) keep Tempus's confidential and proprietary information in strict confidence; (ii) not use Tempus's confidential and proprietary information for his own purposes; (iii) not take Tempus's confidential and proprietary information with him if he left Tempus (and, if he did leave Tempus, to return or destroy such information); and (iv) not disclose Tempus's confidential and proprietary information to any third party.

123. Beyer also agreed and was obligated, for a period of twelve months, not to solicit, encourage, or divert business away (or attempt to do so) from any Tempus customer with whom he had business contact in the last twelve months of his employment, or about whom he acquired confidential and proprietary information, to stop doing business with Tempus or otherwise interfere with Tempus's relationship with such customer.

124. The terms of the Beyer Agreement are not greater than required for the protection of Tempus's legitimate business interests, including its trade secrets and proprietary and confidential information, and the valuable relationships it has cultivated with its customers, which were developed by Tempus at considerable expense, time, and difficulty.

125. Beyer breached the Beyer Agreement when he took Tempus's confidential and proprietary information near the time of his departure from Tempus to join Guardant, Tempus's direct competitor.

126. Tempus fully performed its obligations to Beyer under the Beyer Agreement.

22

127. Tempus has and will continue to suffer damages as a result of Beyer's breach of contract, including without limitation, diminishing value of Tempus's trade secrets and confidential and proprietary information and harm to Tempus's relationships with its customers by unfairly competing for the same Tempus customers with whom Beyer had deep relationships and inalienable familiarity.

128. Tempus's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

129. Beyer's actions will continue to cause harm to Tempus if not restrained.

130. Tempus has demonstrated that Beyer, unless enjoined, has already and will continue to engage in conduct that breaches the Beyer Agreement.

131. The terms of the Beyer Agreement do not pose an undue hardship on Beyer.

132. The Beyer Agreement is not injurious to the public.

133. Beyer acknowledged and agreed Tempus is entitled to injunctive relief should he breach a provision of the Beyer Agreement.

134. Should this Court grant injunctive relief to Tempus, the burden on Beyer would be slight compared to the injury to Tempus if it is not granted. No injury to Beyer would result from an order requiring him to comport his actions under the Beyer Agreement.

135. The grant of an injunction will not disserve the public interest.

## COUNT III
### Breach of Contract – Against Paden
### (Injunctive Relief and Damages)

136. Tempus realleges and incorporates by reference Paragraphs 1 through 135 as though fully set forth herein.

137. The Paden Agreement is a valid and enforceable contract.

138. In consideration for entering into the Paden Agreement, Tempus hired Paden and provided her access to its trade secrets and confidential and proprietary information.

139. Among other obligations in the Paden Agreement, Paden agreed to: (i) keep Tempus's confidential and proprietary information in strict confidence; (ii) not use Tempus's confidential and proprietary information for her own purposes; and (iii) not take Tempus's confidential and proprietary information with her if she left Tempus.

140. Paden also agreed and was obligated, for a period of eighteen months, not to solicit, encourage, or divert business away (or attempt to do so) from any Tempus customer with whom she had business contact in the last twelve months of her employment, or about whom she acquired confidential and proprietary information, to stop doing business with Tempus or otherwise interfere with Tempus's relationship with such customer.

141. The terms of the Paden Agreement are not greater than required for the protection of Tempus's legitimate business interests, including its trade secrets and proprietary and confidential information, and the valuable relationships it has cultivated with its customers, which were developed by Tempus at considerable expense, time, and difficulty.

142. Paden breached the Paden Agreement when she took Tempus's confidential and proprietary information near the time of her departure from Tempus to join Guardant, Tempus's direct competitor.

143. Tempus fully performed its obligations to Paden under the Paden Agreement.

144. Tempus has and will continue to suffer damages as a result of Paden's breach of contract, including without limitation, diminishing value of Tempus's trade secrets and confidential and proprietary information and harm to Tempus's relationships with its customers

by unfairly competing for the same Tempus customers with whom Paden had deep relationships and inalienable familiarity.

145. Tempus's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

146. Paden's actions will continue to cause harm to Tempus if not restrained.

147. Tempus has demonstrated that Paden, unless enjoined, has already and will continue to engage in conduct that breaches the Paden Agreement.

148. The terms of the Paden Agreement do not pose an undue hardship on Paden.

149. Paden acknowledged and agreed Tempus is entitled to injunctive relief should she breach a provision of the Paden Agreement.

150. The Paden Agreement is not injurious to the public.

151. Should this Court grant injunctive relief to Tempus, the burden on Paden would be slight compared to the injury to Tempus if it is not granted. No injury to Paden would result from an order requiring her to comport her actions under the Paden Agreement.

152. The grant of an injunction will not disserve the public interest.

<u>**COUNT III**</u>
**Trade Secrets Misappropriation Under the Illinois Trade Secrets Act**
**Both Defendants**
**(Injunctive Relief and Damages)**

153. Tempus realleges and incorporates by reference Paragraphs 1 through 152 as though fully set forth herein.

154. The Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, prohibits the misappropriation of trade secrets. Under the Act, a trade secret means "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known

to, and not being readily ascertainable by proper means, by others who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

155. Under the Act, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) Disclosure or use of a trade secret of another without the express or implied consent by a person who: (a) Used improper means to acquire knowledge of the trade secret; (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake."

156. Tempus has dedicated substantial time and resources toward developing its sensitive business plans, customer relationships, and the troves of data underlying such relationships. This data covers Tempus's customer lists; customer information including customer needs and preferences, and customer research and development targets and initiatives, pricing structures; prospective customer identities; new product roadmaps; business strategies and forecasting; and other information that provides economic value to Tempus. This information provides Tempus with an advantage in servicing and maintaining its customers by providing them bespoke service based upon its historical familiarity with such customers obtained through years of investment and sweat equity. This information gives Tempus an advantage over its competitors who have not compiled this information or expended the resources to develop these trade secrets.

26

157. This information required substantial resources and time to develop, and it is not publicly known. It maintains its economic value due to its secrecy. At all relevant times, Tempus has made reasonable efforts to ensure that its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Tempus's commercial use only. Tempus allows its employees access to this information only after they have executed confidentiality and non-competition agreements such as the Beyer and Paden Agreements.

158. Beyer and Paden had access to and regularly used Tempus's trade secrets and confidential and proprietary information. In their respective roles as a CAE and Senior CAA, Beyer and Paden worked directly with customers to build, maintain, and manage Tempus's relationships with these customers. Beyer's customer-facing sales and servicing role required him to be intimately familiar with Tempus's proprietary and confidential information, including the granular customer data underlying Tempus's coveted customer relationships, and to serve as the face of Tempus for these customers. Likewise, Paden's role required her to maintain the same level of familiarity with Tempus's proprietary and confidential information as Beyer's role in order to support CAEs (such as Beyer), regularly interact with customers, and ensure customer satisfaction and proper management.

159. Beyer knew he had a duty to maintain the secrecy of Tempus's trade secrets due to his acknowledgement of such under the Beyer Agreement.

160. Paden knew she had a duty to maintain the secrecy of Tempus's trade secrets due to her acknowledgement of such under the Paden Agreement.

161. By virtue of their new sales-based positions with Guardant, a direct competitor of Tempus, Beyer and Paden have threatened and continue to threaten to misappropriate Tempus's trade secrets to compete unfairly with Tempus on behalf of Guardant.

162. Beyer and Paden have already misappropriated Tempus's trade secret information by physically taking and uploading such information near the time of their respective resignations without a legitimate business reason for doing so.

163. Both Beyer and Paden are now employed by Tempus's direct competitor, Guardant, in sales positions and will use the Tempus trade secrets they took to benefit Guardant.

164. To date, none of the files Beyer and Paden took from Tempus have been returned or recovered, and neither Beyer nor Paden have confirmed their deletion or destruction from their possession and/or access despite Tempus's affirmative request for Beyer and Paden to do so.

165. Upon information and belief, Guardant has not taken any actions to prevent Beyer and Paden from using or disclosing Tempus's trade secrets, and any such actions would be ineffectual.

166. In light of the similar sales-based positions between their roles at Tempus (and the fact they are servicing the same sales territory) and Guardant and the fact that the companies are direct competitors in a highly specialized and niche industry, Beyer and Paden will necessarily disclose or continue to disclose and utilize Tempus's trade secrets in the course of their employment with Guardant.

167. Tempus has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including diminution of its trade secrets, harm to its reputation, goodwill, customer relationships, and its competitive advantage.

168. Tempus has no adequate remedy at law for such present and future harm and therefore, is entitled to equitable relief in addition to compensatory relief.

169. Beyer's and Paden's actions will continue to cause irreparable harm and damages to Tempus if not enjoined.

170. Because Beyer and Paden have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Tempus's rights, Tempus is entitled to recover punitive damages from Beyer and Paden, in an amount according to proof at trial.

## COUNT IV
**Trade Secrets Misappropriation Under the Defend Trade Secrets Act**
**Both Defendants**
**(Injunctive Relief and Damages)**

176. Tempus realleges and incorporates by reference Paragraphs 1 through 170 as though fully set forth herein.

177. The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

178. Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

29

179. Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

180. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

181. Tempus dedicated substantial time and resources toward developing its sensitive business plans, customer relationships, and the troves of data underlying such relationships. This data covers Tempus's customer lists; customer information including customer needs and preferences, and customer research and development targets and initiatives, pricing structures; prospective customer identities; new product roadmaps; business strategies and forecasting; and other information that provides economic value to Tempus. This information provides Tempus an advantage in servicing and maintaining its customers by providing them bespoke service based

upon its historical familiarity with such customers obtained through years of investment and sweat equity. This information gives Tempus an advantage over its competitors who have not compiled this information or expended the resources to develop these trade secrets.

182. This information required substantial resources and time to develop, and it is not publicly known. It maintains its economic value due to its secrecy. At all relevant times, Tempus has made reasonable efforts to ensure that its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Tempus's commercial use only. Tempus allows its employees access to this information only after they have executed confidentiality and non-competition agreements such as the Beyer Agreement and the Paden Agreement.

183. Beyer and Paden had access to and regularly used Tempus's confidential information and trade secrets. In their respective roles as a CAE and Senior CAA, Beyer and Paden worked directly with customers to build, maintain, and manage Tempus's relationships with these customers. Beyer's customer-facing sales and servicing role required him to be intimately familiar with Tempus's proprietary and confidential information, including the granular customer data underlying Tempus's coveted customer relationships, and to serve as the face of Tempus for these customers. Paden's role required her to maintain the same level of familiarity with Tempus's proprietary and confidential information as Beyer's role in order to support CAEs (such as Beyer), regularly interact with customers, and ensure customer satisfaction and proper management.

184. Beyer knew he had a duty to maintain the secrecy of Tempus's trade secrets due to his acknowledgement of such under the Beyer Agreement.

185. Paden knew she had a duty to maintain the secrecy of Tempus's trade secrets due to her acknowledgement of such under the Paden Agreement.

186. By virtue of their new sales-based positions with Guardant, a direct competitor of Tempus, Beyer and Paden have threatened and continue to threaten to misappropriate Tempus's trade secrets to compete unfairly with Tempus on behalf of Guardant.

187. Beyer and Paden have already misappropriated Tempus's trade secret information by physically taking and uploading such information near the time of their respective resignations without a legitimate business reason for doing so.

188. Both Beyer and Paden are now employed by Tempus's direct competitor, Guardant, in sales positions (in their same sales territory as Tempus) and will use the Tempus trade secrets they took to benefit Guardant.

189. To date, none of the files Beyer and Paden took from Tempus have been returned or recovered, and neither Beyer nor Paden have confirmed their deletion or destruction from their possession and/or access despite Tempus's affirmative request for Beyer and Paden to do so.

190. Upon information and belief, Guardant has not taken any actions to prevent Beyer and Paden from using or disclosing Tempus's trade secrets, and any such actions would be ineffectual.

191. In light of the similar sales-based positions between their roles at Tempus and Guardant and the fact that the companies are direct competitors in a highly specialized and niche industry, Beyer and Paden will necessarily disclose or continue to disclose and utilize Tempus's trade secrets in the course of their employments with Guardant.

192. Tempus has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including diminution of its trade secrets, harm to its reputation, goodwill, customer relationships, and its competitive advantage.

193. Tempus has no adequate remedy at law for such present and future harm and therefore, is entitled to equitable relief in addition to compensatory relief.

194. Beyer's and Paden's actions will continue to cause irreparable harm and damages to Tempus if not enjoined.

195. Because Beyer and Paden have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Tempus's rights, Tempus is entitled to recover punitive damages from Beyer and Paden, in an amount according to proof at trial.

## **PRAYER FOR RELIEF**

With respect to this Verified Complaint, and based on the foregoing, Plaintiff Tempus AI, Inc. prays for the following relief:

1. Entry of a Temporary Restraining Order against Beyer and Paden consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

2. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Beyer and Paden enjoining each of them from disclosing or using Tempus's confidential, proprietary and trade secret information, and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

3. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Defendants enjoining each of them from violating the Non-Interference provisions of their respective Agreements;

4. For Tempus's attorneys' fees and costs;

5. For actual, compensatory, and exemplary damages to be determined at trial; and

6. Such other and further relief the court deems just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Tempus AI, Inc. hereby asserts its right to a trial by jury on all counts so triable.


Dated: September 18, 2024                                Respectfully submitted,


*/s/ Mikela T. Sutrina*
Mikela T. Sutrina (6311408)
Thomas V. Panoff (6283695)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 N. Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (313) 499-6301
msutrina@sheppardmullin.com
tpanoff@sheppardmullin.com

*Attorneys for Tempus AI, Inc.*

## **VERIFICATION**

I, Alana Bitikofer, am the Vice President for Oncology Sales, North America, for Tempus AI, Inc. and am authorized to make this verification for and on Plaintiff's behalf. I declare that I have read the Verified Complaint and know the contents thereof. I verify the matters and things set forth in Paragraph Nos. 12-21, 25-37, 50-57, 67-79, 95, and 97 are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others, and I am relying in part upon their representations.

I declare under penalty of perjury that the aforesaid is true and correct.

Executed on September 18, 2024

DocuSigned by:

*Alana Bitikofer*

512074799D594BE...

Alana Bitikofer
Vice President for Oncology Sales, North America
Tempus AI, Inc.

DocuSign

## Certificate Of Completion

Envelope Id: B9F3ABB2EBA3482E877606E9071DBE11  
Subject: Complete with Docusign: Tempus v. Beyer and Paden - Complaint Verification  
Client matter #:  
Source Envelope:  
Document Pages: 36  
Certificate Pages: 5  
AutoNav: Enabled  
EnvelopeId Stamping: Disabled  
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 1  
Initials: 0

Status: Completed

Envelope Originator:  
Victoria Hubona  
333 South Hope Street, 43rd Floor  
Los Angeles, CA 90071  
vhubona@sheppardmullin.com  
IP Address: 74.206.122.29

## Record Tracking

Status: Original  
    9/18/2024 10:16:00 AM

Holder: Victoria Hubona  
    vhubona@sheppardmullin.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Alana Bitikofer<br>alana.bitikofer@tempus.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Alana Bitikofer*<br>512074799D594BE...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 4.28.60.194 | Sent: 9/18/2024 10:17:07 AM<br>Viewed: 9/18/2024 10:17:41 AM<br>Signed: 9/18/2024 10:17:46 AM |

**Electronic Record and Signature Disclosure:**  
    Accepted: 9/18/2024 10:17:41 AM  
    ID: 1cd1a841-a6dc-4dce-8584-62235155a2d9

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mikela Sutrina<br>msutrina@sheppardmullin.com<br>Partner<br>Sheppard, Mullin, Richter & Hampton LLP<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 9/18/2024 10:17:07 AM |

**Electronic Record and Signature Disclosure:**  
    Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/18/2024 10:17:07 AM |
| Certified Delivered | Security Checked | 9/18/2024 10:17:41 AM |
| Signing Complete | Security Checked | 9/18/2024 10:17:46 AM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 9/18/2024 10:17:46 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**VERIFICATION**

I, Andrew K. Polovin, am the Executive Vice President, General Counsel, and Secretary for Tempus AI, Inc. and am authorized to make this verification for and on Plaintiff's behalf. I declare that I have read the Verified Complaint and know the contents thereof. I verify the matters and things set forth in Paragraph Nos. 80, 94, and 108-114 are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others, and I am relying in part upon their representations.

I declare under penalty of perjury that the aforesaid is true and correct.

Executed on September 18, 2024 

DocuSigned by:

*Andrew K. Polovin*
01E29E69473746A...

Andrew K. Polovin
General Counsel
Tempus AI, Inc.

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: AE5BAF97E77C440592A2BBB3554844D9 | | Status: Completed |
| Subject: Complete with Docusign: Tempus v. Beyer and Paden - Verification | | |
| Client matter #: | | |
| Source Envelope: | | |
| Document Pages: 36 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Victoria Hubona |
| AutoNav: Enabled | | 333 South Hope Street, 43rd Floor |
| EnvelopeId Stamping: Disabled | | Los Angeles, CA  90071 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | vhubona@sheppardmullin.com |
| | | IP Address: 74.206.122.29 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Victoria Hubona | Location: DocuSign |
| 9/18/2024 10:09:05 AM | vhubona@sheppardmullin.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Andrew K. Polovin | DocuSigned by: | Sent: 9/18/2024 10:13:47 AM |
| andy.polovin@tempus.com | *Andrew K. Polovin* | Viewed: 9/18/2024 10:14:12 AM |
| General Counsel | 01E29E69473746A... | Signed: 9/18/2024 10:14:13 AM |
| Tempus Labs, Inc. | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 4.28.60.194 | |
| **Electronic Record and Signature Disclosure:** | | |
| Accepted: 9/18/2024 10:14:12 AM | | |
| ID: 1b884e01-6faa-4d17-a90b-52b8047360b7 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mikela Sutrina | **COPIED** | Sent: 9/18/2024 10:13:48 AM |
| msutrina@sheppardmullin.com | | |
| Partner | | |
| Sheppard, Mullin, Richter & Hampton LLP | | |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** | | |
| Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/18/2024 10:13:48 AM |
| Certified Delivered | Security Checked | 9/18/2024 10:14:12 AM |
| Signing Complete | Security Checked | 9/18/2024 10:14:13 AM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 9/18/2024 10:14:13 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

-1-

## **VERIFICATION**

I, Greg Fisbeck, am the Chief Information Security Officer for Tempus AI, Inc. and am authorized to make this verification for and on Plaintiff's behalf. I declare that I have read the Verified Complaint and know the contents thereof. I verify the matters and things set forth in Paragraph Nos. 22-24, 70-74, 77, 86-91, and 106-107 are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others, and I am relying in part upon their representations.

I declare under penalty of perjury that the aforesaid is true and correct.

Executed on September 18, 2024

Signed by:

*Greg Fisbeck*

E11AFE3C94254CF...

_____

Greg Fisbeck
Chief Information Security Officer
Tempus AI, Inc.

-1-

DocuSign

## Certificate Of Completion

Envelope Id: 6408B3C0CFBF4B24B23A76CDE1BB4505                    Status: Completed

Subject: Complete with Docusign: Tempus v. Beyer and Paden - Verified Complaint.docx, Tempus v. Beyer an...

Client matter #:

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 36 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Victoria Hubona |
| AutoNav: Enabled | | 333 South Hope Street, 43rd Floor |
| EnvelopeId Stamping: Disabled | | Los Angeles, CA  90071 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | vhubona@sheppardmullin.com |
| | | IP Address: 74.206.122.29 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Victoria Hubona | Location: DocuSign |
| 9/18/2024 10:17:18 AM | vhubona@sheppardmullin.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Greg Fisbeck<br>greg.fisbeck@tempus.com<br>Security Level: Email, Account Authentication (None) | **Signed by:**<br>*Greg Fisbeck*<br>E11AFE3C94254CF...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 4.28.60.194 | Sent: 9/18/2024 10:19:14 AM<br>Viewed: 9/18/2024 10:27:55 AM<br>Signed: 9/18/2024 10:28:23 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 9/18/2024 10:27:55 AM
ID: 334a5458-d5df-4d39-83cc-a065a1d01d90

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mikela Sutrina<br>msutrina@sheppardmullin.com<br>Partner<br>Sheppard, Mullin, Richter & Hampton LLP<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 9/18/2024 10:19:14 AM |

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/18/2024 10:19:14 AM |
| Certified Delivered | Security Checked | 9/18/2024 10:27:55 AM |
| Signing Complete | Security Checked | 9/18/2024 10:28:23 AM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 9/18/2024 10:28:23 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

-1-

## **<u>VERIFICATION</u>**

I, Lindsey Sheldon, am the Senior Director of Human Resources for Tempus AI, Inc. and am authorized to make this verification for and on Plaintiff's behalf. I declare that I have read the Verified Complaint and know the contents thereof. I verify the matters and things set forth in Paragraph Nos. 5-7, 25-26, 38-50, 56, 58-69, 81-85, 93, and 102 are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others, and I am relying in part upon their representations.

I declare under penalty of perjury that the aforesaid is true and correct.

DocuSigned by:

*Lindsey Sheldon*

938A0C1B216E41B...

Executed on September 18, 2024 _____

Lindsey Sheldon
Senior Director of Human Resources
Tempus AI, Inc.

-1-

DocuSign

## Certificate Of Completion

Envelope Id: 950CC8876A4E43A4ADD3F35340C27737
Subject: Complete with Docusign: Tempus v. Beyer and Paden - Complaint Verification
Client matter #:
Source Envelope:
Document Pages: 36
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Disabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 1
Initials: 0

Status: Completed

Envelope Originator:
Victoria Hubona
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
vhubona@sheppardmullin.com
IP Address: 74.206.122.29

## Record Tracking

Status: Original
    9/18/2024 10:19:56 AM

Holder: Victoria Hubona
    vhubona@sheppardmullin.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Lindsey Sheldon<br>lindsey.sheldon@tempus.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Lindsey Sheldon*<br>938A0C1B216E41B...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 4.28.60.194 | Sent: 9/18/2024 10:22:35 AM<br>Viewed: 9/18/2024 10:22:54 AM<br>Signed: 9/18/2024 10:23:01 AM |

**Electronic Record and Signature Disclosure:**
    Accepted: 9/18/2024 10:22:54 AM
    ID: 30723b19-339b-4af7-a65c-b2d9412bc8c6

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mikela Sutrina<br>msutrina@sheppardmullin.com<br>Partner<br>Sheppard, Mullin, Richter & Hampton LLP<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 9/18/2024 10:22:36 AM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/18/2024 10:22:36 AM |
| Certified Delivered | Security Checked | 9/18/2024 10:22:54 AM |
| Signing Complete | Security Checked | 9/18/2024 10:23:01 AM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 9/18/2024 10:23:01 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**