**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TEMPUS AI, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 24-cv-08592 |
| | ) | |
| SEAN BEYER, an individual, CYDNEY PADEN, an individual, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF TEMPUS AI, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Mikela T. Sutrina (6311408)
Thomas V. Panoff (6283695)
**SHEPPARD MULLIN RICHTER & HAMPTON
LLP**
321 North Clark Street, 32nd Floor
Chicago, IL 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
msutrina@sheppardmullin.com
tpanoff@sheppardmullin.com

*Counsel for Plaintiff Tempus AI, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...........................................................................................1

RELEVANT FACTUAL BACKGROUND..................................................................................2

I.     Tempus's Business.................................................................................................2

II.    Beyer's Role and Duties at Tempus.......................................................................4

III.   Beyer's Agreement with Tempus ..........................................................................5

IV.   Paden's Role and Duties at Tempus .....................................................................6

V.    Paden's Agreement with Tempus .........................................................................7

VI.   Defendants' Resignation and Pre-Resignation Activities....................................9

VII.  Defendants' Employment with Guardant ...........................................................11

ARGUMENT ..........................................................................................................................13

I.     The Governing Legal Standard Warrants Issuance of a TRO ............................13

II.    Tempus Is Likely to Succeed on the Merits of Its Breach of Contract Claims ................14

    A.    The Agreements are Valid and Enforceable Contracts and Tempus Performed Under the Agreements ..........................................................14

    B.    Defendants Breached the Agreements ..................................................17

    C.    Defendants' Breaches Have and Will Injure Tempus............................19

III.   Tempus Is Likely to Succeed on the Merits of Its Trade Secret Misappropriation Claims Under Illinois and Federal Law ...............................................................19

    A.    Tempus's Customer Information Constitutes Trade Secrets ................20

         i.     Tempus Invests In and Protects Its Trade Secrets ....................22

    B.    The Evidence Establishes Beyer And Paden Have Already Misappropriated Trade Secrets and Strongly Indicates They Will Inevitably Disclose and Use Tempus's Trade Secrets..........................23

         i.     Guardant is Tempus's Direct Competitor .................................25

         ii.    Defendants' Roles at Guardant Mirror Their Former Roles at Tempus.......................................................................................25

         iii.   Any Efforts Guardant Takes to Protect Tempus's Trade Secrets are Futile .........................................................................................26

         iv.   Defendants' Pre-Resignation Conduct Further Evidences the Inevitable Risk of Disclosure..........................................................26

IV.   Tempus Will Suffer Irreparable Harm in the Absence of a TRO .....................27

V.    The Balance of Hardships Strongly Favors Tempus and The Issuance of a TRO Will Not Disserve the Public Interest ...............................................................28

i

CONCLUSION.................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Allied Waste Servs. Of N. Am., LLC v. Tibble*
177 F. Supp. 3d 1103 (N.D. Ill. 2016) ...................................................................19

*Aon PLC v. Infinite Equity, Inc.*
No. 19-cv-7504, 2021 WL 4192072 (N.D. Ill. Sept. 15, 2021) ...........................21, 24, 27, 29

*APC Filtration, Inc. v. Becker*
646 F. Supp. 2d 1000 (N.D. Ill. 2009) .................................................................21

*Brown & Brown, Inc. v. Ali*
592 F. Supp. 1009 (N.D. Ill. 2009) .....................................................................29

*Brunswick Corp. v. Jones*
784 F.2d 271 (7th Cir. 1986) ...............................................................................29

*Complete Bus. Sols., Inc. v. Mauro*
No. 01-cv-0363, 2001 WL 290196 (N.D. Ill. Mar. 16, 2001) .................................24

*Cumulus Radio Corp. v. Olson*
No. 15-cv-1067, 2015 U.S. Dist. LEXIS 199398 (C.D. Ill. Mar. 17, 2015)
........................................................................................................................15

*Cumulus Radio Corp. v. Olson*
80 F. Supp. 3d 900, 911 (C.D. Ill. 2015) ..............................................................17

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*
420 F. Supp. 2d 866 (N.D. Ill. 2006) ...................................................................27

*Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*
No. 13-cv-02090, 2013 WL 1446425 (N.D. Ill. Apr. 9, 2013) .................................16

*Garon Foods, Inc. v. Montieth*
No. 13-cv-214-JPG-PMF, 2013 WL 3338292 (S.D. Ill. July 2, 2013) ....................19

*Groupon, Inc. v. Shin*
No. 21-cv-6082, 2022 WL 60526 (N.D. Ill. Jan. 6, 2022) .......................15, 21, 24, 27, 28, 29

*Inmar, Inc. v. Vargas*
No. 18-cv-2306, 2018 WL 6716701 (N.D. Ill. Dec. 21, 2018) .........................21, 22

*Lakeview Tech., Inc. v. Robinson*
446 F.3d 655 (7th Cir. 2006) ...............................................................................26

*Lawson Prod., Inc. v. Morichelli*
707 F. Supp. 3d 759 (N.D. Ill. 2023) ...........................................................16, 17

*Liebert Corp. v. Mazur*
357 Ill. App. 3d 265 (1st Dist. 2005) ...........................................................25, 26

*Life Spine, Inc. v. Aegis Spine, Inc.*
8 F.4th 531 (7th Cir. 2021) ..............................................................................27

*Mays v. Dart*
453 F. Supp. 3d 1074 (N.D. Ill. 2020) ...............................................................13

*McInnis v. OAG Motorcycle Ventures, Inc.*
35 N.E.3d 1076 (Ill. App. Ct. 2015) ..................................................................15

*Mickey's Linen v. Fischer*
No. 17-cv-2154, 2017 WL 3970593 (N.D. Ill. Sept. 8, 2017) ..............................19, 26, 27, 29

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*
No. 16-cv-03545, 2017 WL 1954531 (N.D. Ill. May 11, 2017) ...............................24

*Moss Holding Co. v. Fuller*
No. 20-cv-01042, 2020 WL 1081730 (N.D. Ill. Mar. 6, 2020)
.....................................................................................................14, 16, 18, 21, 23

*NAV Consulting, Inc. v. Kumawat*
No. 1:22-cv-03624, Mem. Op. & Order (Dkt. 112), at 17-18 (N.D. Ill. Mar. 31, 2023) .........24

*OptionsCity Software, Inc. v. Baumann*
No. 15-cv-5019, 2015 WL 3955622 (N.D. Ill. June 19, 2015) ...............................17

*Packaging Corp. of Am., Inc. v. Croner*
419 F. Supp. 3d 1059 (N.D. Ill. 2020) ...............................................................24

*PepsiCo, Inc. v. Redmond*
54 F.3d 1262 (7th Cir. 1995) ...........................................................................24

*Prairie Rheumatology Assocs., S.C. v. Francis*
24 N.E.3d 58 (Ill. App. Ct. 3d Dist. 2014)...........................................................14

*Reliable Fire Equip. Co. v. Arredondo*
965 N.E.2d 393 (Ill. 2011) .................................................................14, 15, 17

*RKI, Inc. v. Grimes*
177 F. Supp. 2d 859 (N.D. Ill. 2001) ..............................................22, 23, 26-27

*SKF USA, Inc. v. Bjerkness*
636 F. Supp. 2d 696 (N.D. Ill. 2009) ................................................................21

iv

*Strata Mktg., Inc. v. Murphy*
  317 Ill. App. 3d 1054 (1st Dist. 2000) ...................................................................23, 24, 25

*Vendavo, Inc. v. Long*
  397 F. Supp. 3d 1115 (N.D. Ill. 2019) ..............................................................................21, 23

*W. Capra Consulting Grp., Inc. v. Snyder*
  No. 19-cv-4188, 2019 WL 3935045 (N.D. Ill. Aug. 20, 2019) .............................................28

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*
  858 F.3d 1034 (7th Cir. 2017) ...............................................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008).....................................................................................................................27

*Wolff v. Bethany N. Suburban Grp.*
  2021 IL App (1st) 191858 (Ill. App. Ct. 1st Dist. 2021) ........................................................14

Statutes

765 ILCS 1065/1, *et seq*.....................................................................................1, 19, 20, 24, 26

765 ILCS 1065/2(d) ..........................................................................................................................20

765 ILCS 1065/3(a) ..........................................................................................................................19

18 U.S.C. § 1831, *et seq*.....................................................................................1, 19, 20, 24, 26

18 U.S.C. § 1836(b)(1) .....................................................................................................................19

18 U.S.C. § 1836(b)(3) .....................................................................................................................19

18 U.S.C. § 1893(3) ..........................................................................................................................20

Other Authorities

Federal Rules of Civil Procedure Rule 65 ......................................................................................1

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Tempus AI, Inc. ("Tempus") respectfully moves for a temporary restraining order ("TRO") enjoining Defendants Sean Beyer ("Beyer") and Cydney Paden ("Paden") from using or disclosing Tempus's confidential and proprietary information and its trade secrets in contravention of their valid and enforceable employment agreements, the Illinois Trade Secrets Act, and the federal Defend Trade Secrets Act, and from unlawfully soliciting Tempus's customers.

## PRELIMINARY STATEMENT

This action arises out of a pattern of conduct by two key former sales employees – Beyer and Paden – who recently resigned from Tempus to join one of its direct competitors, Guardant Health, Inc. ("Guardant"). Mere days before leaving Tempus to join competitor Guardant, Beyer and Paden each secretly exfiltrated Tempus's detailed confidential and proprietary information pertaining to its customer accounts, products, and services. Beyer and Paden printed, exported, and/or downloaded nearly thirty distinct Tempus files even though they had no legitimate business reason for doing so. Many of these files contain highly sensitive and competitive information, including:

- an Excel spreadsheet titled "Cyd Tracking Sheets" containing specific information about Tempus's customers, their contact information, ordering preferences, and unique attributes about their ordering habits, among other proprietary information;

- two CSV files exported from Tempus's proprietary Business Intelligence Platform, which appear to contain confidential and highly sensitive ordering information about Tempus's customers; and

- numerous other files containing detailed information about Tempus customers' accounts, products, and services.

Within days of exporting this information, and after misrepresenting their post-Tempus plans, Beyer and Paden immediately joined Guardant in materially identical sales roles and in substantially the same territory in which they worked for Tempus.

1

Tempus uncovered Defendants' misconduct by conducting extensive forensics after learning that Beyer gave a presentation on Tempus's products and services to his new Guardant colleagues. Defendants are now poised to target the exact same customers with whom they worked at Tempus, benefitting Guardant and causing Tempus irreparable harm, including diminution of its trade secrets, harm to its reputation, goodwill, customer relationships, and its competitive advantage. Defendants' conduct violates their respective Tempus employment agreements (the "Agreements"), as well as Illinois and federal law.

Tempus, for its part, has sought assurances and explanations from Defendants regarding the current location of its proprietary data, the reason for exporting and uploading the data, a full accounting of the current status of the data, and assurances that Beyer and Paden intend to comply with their confidentiality and non-disclosure obligations. Defendants have personally refused to provide any explanation justifying their conduct or provide a single assurance to Tempus regarding the integrity of its confidential and proprietary information and trade secrets.

Lacking an adequate remedy at law and seeking to prevent any further irreparable harm, Tempus now requests an emergency injunction to prevent Defendants from disclosing Tempus's confidential and proprietary information and its trade secrets. In the absence of an injunction, Tempus will continue to face irreparable harm. Injunctive relief is warranted.

<u>**RELEVANT FACTUAL BACKGROUND**</u>

### I.     Tempus's Business

Tempus is a healthcare technology company based in Chicago, Illinois. (Verified Complaint ("Ver. Compl.") ¶¶ 5, 12.) Tempus has revolutionized medical care by combining next-generation sequencing, real-world data, technology, and artificial intelligence. (*Id.* ¶ 12.) The two main components of Tempus's multifaceted business are Genomic Sequencing and Data. (*Id.* ¶ 14.)

Through its Genomic Sequencing business, Tempus provides next-generation sequencing ("NGS") and analyzes patients' DNA and RNA data to help identify potential treatment options based on patients' unique genomic makeup, primarily for oncology patients. (*Id.* ¶ 15.) Tempus's sales teams are responsible for growing, developing, and retaining its NGS testing customer base in their assigned territories. (*Id.* ¶ 16.) Tempus's primary customers include health systems, oncology practices, cancer centers and clinics, and independent physicians. (*Id.*)

Few companies operate in the same space as Tempus, making competition fierce. (*Id.* ¶ 18.) Companies like Tempus operate in a nascent industry, where options are limited and prospective customer spend is finite. (*Id.*.) Tempus has been able to gain a competitive edge through massive investment, its extensive and targeted training of its employees, its strategic and thorough monitoring and planning of operations, its commitment to and development of customer relationships and understanding customer goals and needs, its ongoing and continuing development of cutting-edge technology, and its deployment of data in improving patient outcomes. (*Id.*)

Tempus has invested extensive and substantial resources, time, and expense in developing its trade secrets and protecting its reputation and relationships with customers and other business contacts. (*Id.* ¶ 19.) To build and maintain these critical business investments and competitive advantages, Tempus provides confidential information and trade secrets as needed to employees, like Beyer and Paden, who are tasked with growing, developing, and retaining Tempus's customer relationships, collaborations, and partnerships. (*Id.* ¶ 21.)

To protect its confidential information and trade secrets, Tempus utilizes multiple security measures. (*Id.* ¶¶ 22-24.) These security measures include, among other things, requiring employees to sign non-disclosure and confidentiality agreements; limiting access to confidential

information and trade secrets to certain levels of employees; password-protecting Tempus's systems and information; requiring two-factor authentication to access Tempus's systems and information; leveraging third-party systems (such as Okta, Crowdstrike, and WorkspaceOne) to protect the integrity of Tempus's proprietary systems and data; and requiring employees to attend trainings covering protection of Tempus's information. (*Id.*)

## II.    Beyer's Role and Duties at Tempus

In November 2022, Tempus hired Beyer as a Clinical Account Executive ("CAE") as part of the West Clinical Sales – Mountain Sales team covering Arizona, New Mexico, and parts of Texas. (*Id.* ¶ 25.) As a CAE, Beyer was in a core customer-facing sales and servicing role where his main job duties included securing, retaining, and servicing Tempus's customers and meeting sales objectives and goals. (*Id.* ¶ 27.) CAEs are tasked with working with customers seeking to order Tempus tests and products, ensuring a smooth process once an order has been placed, and closely managing, developing, and growing Tempus's customer relationships. (*Id.*)

Beyer also drove Tempus's strategic business expansion and collaboration and partnership opportunities with a number of key providers in his territory, including major cancer centers, clinics, and oncology practices. (*Id.* ¶ 28.) He was responsible for developing and implementing a comprehensive business plan for his territory, which included strategic review of Tempus's initiatives, growth opportunities, current market weaknesses, and areas for tactical engagement. (*Id.* ¶ 29.) Beyer further analyzed the competitive landscape to ensure Tempus stayed ahead of its competition, such as Guardant. (*Id.* ¶ 30.)

As a CAE, Beyer had access to and regularly worked with Tempus's confidential, proprietary, and trade secret information. (*Id.* ¶ 31.) Through Tempus's customer relationship management platform, Beyer had access to granular information about Tempus's customers. (*Id.* 32.) Indeed, Beyer has a deep understanding of Tempus's customers and targets in his territory,

4

including confidential information regarding such customers' unique ordering habits, goals, priorities, and pressure points. (*Id.*) Beyer is also intimately familiar with Tempus's products, services, technology, and pricing, all of which would be critical information for a competitor. (*Id.* ¶ 34.) Beyer also had access to Tempus's Business Intelligence Platform, where Tempus collects and stores a variety of its confidential and proprietary information, including customer order and account information. (*Id.* ¶ 35.)

### III. Beyer's Agreement with Tempus

In early November 2022, in connection with Tempus's offer of employment to Beyer, Tempus presented Beyer with a copy of its Confidentiality, Intellectual Property and Protective Covenants Agreement (the "Beyer Agreement") for his consideration and execution. (*Id.* ¶ 38.) On November 7, 2022, Beyer executed the Beyer Agreement. (*Id.* ¶ 39.) In exchange for Beyer's execution of the Beyer Agreement, Tempus hired and employed Beyer and granted him Restricted Stock Units ("RSUs"). (*Id.* ¶ 40.)

In pertinent part, the confidentiality and non-disclosure provisions of the Beyer Agreement, which is governed by Illinois law, provide:

> a. *Confidential and Proprietary Information*. Your job requires you to be exposed to confidential or proprietary information ["CPI"] of Tempus, its subsidiaries, and other third parties, including technical and commercial information related to Tempus, its customers', or its prospective customers' business that is not generally known to the public. CPI includes, among other things, all patent applications, trade secrets, and other intellectual and tangible property rights in all Innovations. CPI also includes proprietary or confidential information of any other third party who may disclose such information to Tempus or to you under any obligation of confidentiality in the course of Tempus's business, including protected health information and personal data protected by applicable law. CPI is valuable to Tempus and the core of our business. Employees who will be exposed to CPI must sign an agreement before joining our team to protect CPI.
>
> b. *Ownership of and Obligations Regarding Innovations*.
>      . . .
>      v. You agree to keep all CPI that you encounter in strict confidence, even after you leave Tempus. You cannot use CPI for your own purposes, you cannot take

> CPI with you if you leave (in fact, you are required to give it back or destroy it), and you cannot disclose CPI to any third party unless required to do so as part of your job at Tempus, or because of a legitimate law enforcement demand.

(*Id*. ¶ 41.)

The Beyer Agreement also contains tailored non-compete and non-solicitation provisions.[1]

(*Id*. ¶ 42.) In pertinent part, Beyer agreed that, for a period of twelve months after leaving Tempus, he would not:

> directly or indirectly solicit or encourage, attempt to solicit or encourage, or divert business away from any Tempus customer, prospective customer, or any entity or person with whom Tempus has a business relationship, (i) that you had business contact with during the last 12 months of your employment, or (ii) about whom you acquired CPI during the last 12 months of your employment with Tempus, to stop doing business with Tempus, or otherwise interfere in any way with Tempus's relationship with such entity or person.

(*Id*.) Beyer further acknowledged that Tempus would be entitled to injunctive relief should he breach any provision of the Beyer Agreement. (*Id*. ¶ 45.)

## IV. Paden's Role and Duties at Tempus

In May 2019, Tempus hired Paden as a Clinical Account Associate ("CAA") and promoted her to a Senior CAA in January 2021. (*Id*. ¶¶ 50, 56.) In both roles, Paden worked on the same team as Beyer: West Clinical Sales – Mountain Sales. (*Id*. ¶ 51.) The CAA and Senior CAA roles were sales-support and customer-facing positions. (*Id*. ¶¶ 51, 56) In these roles, Paden supported Tempus's CAEs, including Beyer, by managing day-to-day customer issues and ensuring physicians' orders were on track, timely, and receiving the appropriate care and follow-up. (*Id*. ¶ 52.) Paden's role was critical to ensuring customer satisfaction and ensuring CAEs were able to devote their time and resources to develop Tempus's business. (*Id*. ¶ 53.) Paden also regularly

---

[1] Tempus is not presently seeking to enforce the Non-Compete provision of the Beyer Agreement and prevent Beyer from continuing in his current employment with Guardant. However, Tempus reserves its right to enforce this provision and is not waiving any rights available to it under the Beyer Agreement.

interacted with Tempus's customers directly and built relationships with customers on behalf of Tempus. (*Id.* ¶ 52.)

Paden is not only intimately familiar with Tempus's products and services but also, more importantly, its customer base in her territory. (*Id.* ¶ 54.) Through Tempus's systems, including its Business Intelligence Platform, Paden had access to and regularly utilized detailed confidential information related to Tempus's customers, including names, contact information, specialties, and specifics concerning their relationships with Tempus. (*Id.*) Like Beyer, Paden understands Tempus's customers' preferences, ordering history, priorities, and other sensitive customer-specific details. (*Id.*)

## V.    Paden's Agreement with Tempus

In May 2019, in connection with Tempus's offer of employment to Paden, Tempus presented Paden with a copy of its Confidentiality, Intellectual Property and Restrictive Covenants Agreement (the "Paden Agreement") for her consideration and execution. (*Id.* ¶ 58.) On May 14, 2019, Paden executed the Paden Agreement. (*Id.* ¶ 59.) In exchange for Paden's execution of the Paden Agreement, Tempus hired and employed Paden. (*Id.*)

In pertinent part, the confidentiality and non-disclosure provisions of the Paden Agreement, which is governed by Illinois law, provide:

> 1. <u>Proprietary Information</u>. My employment status creates a relationship of confidence and trust between Tempus and me with respect to any information that is not generally known to the public or is otherwise treated by Tempus as confidential or proprietary and is: (a) applicable to the business of Tempus or its subsidiaries; or (b) applicable to the business of any client or customer of Tempus or its subsidiaries, which may be made known to me by Tempus or by any client or customer of Tempus or its subsidiaries, or learned by me in such context during the period of my employment.
>
> All such information has commercial value in the business in which Tempus is engaged and is hereinafter called "Proprietary Information." By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trade secret, and proprietary

information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and formulae related to the current, future and proposed products and services of Tempus or its subsidiaries, and including, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales and merchandising and marketing plans and information. "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Tempus or to me under any obligation of confidentiality in the course of Tempus's business.

2. <u>Ownership and Confidentiality of Proprietary Information</u>.

. . .

(b) At all times, both during my employment by Tempus and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and, except as necessary to meet Tempus's business needs, I will not: (i) use any Proprietary Information; (ii) directly or indirectly permit a third party to obtain access to any Proprietary Information; or (iii) transmit or disclose any Proprietary Information to any person, concern or entity. Further, I shall not make use of any Proprietary Information, directly or indirectly, for myself or for others, including, without limitation, in connection with any other employment or consulting capacity. . . .

(c) All non-disclosure obligations of paragraph 2(b) above shall apply (i) as to Proprietary Information other than trade secrets, at all times during my employment and for two (2) years after termination of such employment, and (ii) as to trade secrets, for as long as such trade secrets retain their status as a "trade secret" under applicable law.

(*Id.* ¶ 60.)

The Paden Agreement also contained non-compete and non-solicitation provisions.[2] (*Id.* ¶ 61.) Specifically, as it relates to customer non-solicitation, Paden agreed that, for a period of eighteen months after separation from Tempus, she would not:

. . . I will not, other than on behalf of Tempus, directly or indirectly without the prior written consent of Tempus (i) induce or attempt to induce any merchant,

---

[2] Tempus is not seeking to enforce the Non-Compete provision of the Paden Agreement and prevent Paden from continuing in her current employment with Guardant. However, Tempus reserves its right to enforce this provision and is not waiving any rights available to it under the Paden Agreement.

customer, supplier, licensee, or business relation of Tempus to cease doing business with Tempus, or in any way interfere with the relationship between Tempus and any merchant, customer, supplier, licensee, or business relation of Tempus or (ii) solicit or participate in soliciting the business of any then-current or prospective merchant or customer which was a merchant or customer of Tempus within one year prior to such solicitation, to purchase products or services similar to, or competitive with, the products or services then offered by Tempus, if I had direct contact with the merchant or customer or any confidential information related to such products or services during the 12 months preceding the termination of my employment or relationship with Tempus . . . .

(*Id*.) Paden further agreed Tempus would be entitled to injunctive relief should she breach the Paden Agreement. (*Id*. ¶ 64.)

## VI. Defendants' Resignation and Pre-Resignation Activities

On July 22, 2024, Paden tendered her resignation to Tempus, and on July 30, 2024, Beyer tendered his resignation. (*Id*. ¶¶ 67, 84.) At the time of their resignations, neither Paden nor Beyer notified Tempus that they planned to join its direct competitor, Guardant. (*Id*. ¶¶ 69, 85.) Instead, Paden falsely told Tempus that she intended to "take time off," indicating she would not immediately join another company. (*Id*. ¶ 85.) Beyer gave the impression he was joining a "pharmaceutical company." (*Id*. ¶ 68.)

Directly prior to, on the same day as, and after tendering their respective resignation notices, both Paden and Beyer improperly exported troves of Tempus data. (*Id*. ¶¶ 70-74, 86-90.) Between June 28, 2024 and July 22, 2024, Paden used her Tempus laptop to export a number of Tempus files to a (currently unknown) destination via a Google Chrome Web Browser. (*Id*. ¶ 86.) These files included files titled "Add-On Orders [POI].csv," "Add-On Orders [POI].txt," "Add-On Orders [POI].csvf," "JS documents.pdf," and "pathology 2 (1).pdf." (*Id*.) On the day of her resignation, Paden uploaded an additional nine files via a Google Chrome Web Browser to an unknown destination. (*Id*. ¶ 88.) Through her last day of employment with Tempus, July 31, 2024, Paden uploaded an additional ten files to an unknown destination via a Google Chrome Web

Browser. (*Id*. ¶ 89.) And, on her last day of employment, Paden downloaded an Excel file titled "Cyd Tracking Sheets" from her Google Drive account, then uploaded the spreadsheet to an unknown destination via a Chrome Web Browser. (*Id*. ¶ 90.) Notably, the Excel file "Cyd Tracking Sheets" contains a significant amount of Tempus's proprietary and highly confidential information, including lists of institutions and healthcare providers who order Tempus's products and tests (in addition to a history of their ordering history), a list of healthcare providers' contact information, the healthcare providers' ordering preferences, and unique attributes about the healthcare providers' ordering habits, among other proprietary information. (*Id*. ¶ 71.) Also on her last day, Paden permanently cleared and deleted her Google Chrome Browser history prior to returning her computer to Tempus. (*Id*. ¶ 91.)

On August 2, 2024, three days after he tendered his resignation, Beyer engaged in similar conduct as Paden. Beyer sent two emails with attachments from his Tempus email address to his personal, non-Tempus email address. (*Id*. ¶ 70.) One email contained a filed titled "Tumor Types with Corresponding Genes and Syndromes [INTERNAL USE ONLY]," and the other email contained the Excel file titled "Cyd Tracking Sheets" (which was the same file Paden exfiltrated on her final day at Tempus). (*Id*.) The file titled "Tumor Types with Corresponding Genes and Syndromes [INTERNAL USE ONLY]" is a compilation of Tempus-collected data and research related to various cancers, gene panels, and clinical review notes. (*Id*. ¶ 71.) On the following day, Beyer affirmatively moved both emails and their attachments from the "Sent" folder of his Tempus email account to the "Trash" folder. (*Id*. ¶ 73.) Then, on August 7, 2024, Beyer uploaded four Tempus files via a Google Chrome Web Browser on his Tempus laptop to an unknown destination. (*Id*. ¶ 74.) In the days before leaving Tempus, Beyer exported and printed additional Tempus files, including an Excel and PDF file titled "Orders By Physician" and another PDF file titled "Orders

10

by Hierarchy_Account." (*Id.* ¶ 77.) Hierarchy Account refers to how Tempus organizes customer information within Salesforce. (*Id.*)

The documents Paden and Beyer secretly exported are highly valuable to a competitor because they contain provider and physician ordering information and data that Tempus has collected over years of its relationships with these entities and/or individuals. (*Id.* ¶ 78.) These documents provide detail a competitor needs to gain an advantage over Tempus and expand its own market share at Tempus's expense. (*Id.*) Given their imminent departures from Tempus, neither Paden nor Beyer had a legitimate business reason to swipe or retain these files. (*Id.* ¶¶ 76-77, 92.) Beyer took this information despite executing a Departure Certification providing that he would "promptly return to Tempus all company property (whether in electronic or tangible form) in [his] possession," and that he "made a diligent search to locate such property and information." (*Id.* ¶ 82.) Paden declined to sign Tempus's Departure Certification. (*Id.* ¶ 93.)

To date, Defendants have simply refused to personally provide Tempus with a single assurance regarding its confidential and proprietary information or even attempt to explain their misconduct. (*Id.* ¶¶ 110-11, 114.) And, of course, Defendants have not returned any of these files to Tempus. (*Id.* ¶¶ 80, 94.)

**VII.    Defendants' Employment with Guardant**

Guardant is one of Tempus's direct competitors. (*Id.* ¶ 95.) Like Tempus, Guardant is a precision medicine company, which claims to be "redefining cancer care by driving a more personalized and data-driven approach that improves on traditional standards of care." (*Id.* ¶ 96.) Per its website, Guardant also uses "precision oncology" in "helping patients across all stages of the disease." (*Id.*) Both Guardant and Tempus collaborate with major cancer centers and clinics, oncology practices, and key providers nationally to provide precision medicine and targeted therapies, particularly in oncology and late-stage cancer diagnoses. (*Id.* ¶ 97.)

Guardant has specifically represented that some of its competitors, which includes Tempus, have "larger customer bases; greater brand recognition and market penetration," and are "able to respond more quickly to changes in customer requirements, [and] devote greater resources to the development, promotion and sale of their tests," giving them an edge in the industry, higher revenues, and higher profitability. (*Id*. ¶ 100.)

As detailed in its Annual Report, Guardant is focused on growing its sales team in order to better address its customers' needs and increase its sales and revenue. (*Id*. ¶ 101.) Skilled, knowledgeable, and effective sales executives are critical to Guardant's business and future success. (*Id*.) Guardant obviously considers Tempus one of its primary competitors in numerous spaces, and Guardant has engaged in an aggressive recruiting campaign of Tempus's sales employees in recent months. (*Id*. ¶ 102.)

In early September 2024, Tempus learned that both Beyer and Paden were working for Guardant in sales roles, and that Beyer had recently given a presentation on Tempus's products and services to his Guardant colleagues. (*Id*. ¶ 106.) Tempus immediately engaged in a thorough forensic investigation to determine whether or not Beyer or Paden engaged in any bad acts prior to their departures. (*Id*.) Tempus's forensic investigation uncovered Beyer's and Paden's breaches of their various confidentiality obligations detailed above. (*Id*. ¶ 107.)

As a result, on September 9, 2024, Tempus sent Beyer, Paden, and Guardant a letter detailing the findings of Tempus's forensic investigation and Tempus's concerns with the location and integrity of its confidential and proprietary information. (*Id*. ¶ 108.) Tempus also highlighted its concern with Beyer's presentation on Tempus's products and services to Guardant employees, especially in light of his apparent exfiltration of confidential information prior to his departure from Tempus. (*Id*. ¶ 109.)

On September 12, 2024, Guardant sent Tempus a high-level response, but did not address many of the issues raised by Tempus. (*Id*. ¶ 110.) Guardant's letter conceded that Beyer emailed the "Cyd Tracking Sheets" to his personal email account. (*Id*. ¶ 111.) Guardant's letter also conceded that the spreadsheet contained sensitive information. (*Id*.) Guardant's letter did not address, nor did it deny, whether Beyer gave a presentation detailing Tempus's products and services to Guardant employees. (*Id*. ¶ 112.)

Neither Beyer nor Paden responded substantively to Tempus. (*Id*. ¶ 114.) Indeed, to date, neither Beyer nor Paden have provided any justifications for apparently exfiltrating Tempus's proprietary and confidential information ahead of their departures from the company, information regarding their access or use of this information since leaving Tempus, or the current location of Tempus's confidential and proprietary data they pilfered on their way out the door. (*Id*.)

## ARGUMENT

### I.    The Governing Legal Standard Warrants Issuance of a TRO

The Court should exercise its discretion to grant the requested TRO to prevent further harm to Tempus's protectable business interests. To obtain a TRO, the movant must establish: (1) without the requested relief, the movant will suffer irreparable harm during the pendency of the action; (2) traditional legal remedies would be inadequate; and (3) the movant has some likelihood of success on the merits. *Mays v. Dart*, 453 F. Supp. 3d 1074, 1087 (N.D. Ill. 2020) (citing *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017)). If the Court finds these requirements have been met, it must then consider what harm the nonmoving party will suffer if injunctive relief is granted, balancing such potential harm against the irreparable harm the moving party will suffer if relief is denied. *Id.* Finally, the Court must consider whether the grant of injunctive relief furthers the public interest. *Id.* Tempus is entitled to a TRO because the facts here readily satisfy each of the required elements.

13

## II.     Tempus Is Likely to Succeed on the Merits of Its Breach of Contract Claims

Beyer and Paden breached, and will continue to breach, the Agreements by taking Tempus's confidential and proprietary information, refusing to return or destroy such information, and retaining this information for the benefit of Guardant, risking Tempus's customer relationships. In moving for injunctive relief, a party "must only show that [its] chances to succeed on [its] claims are better than negligible. This is a low threshold." *Moss Holding Co. v. Fuller*, No. 20-cv-01042, 2020 WL 1081730, \*5 (N.D. Ill. Mar. 6, 2020).

The essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting injury to the plaintiff, each of which is easily met here. *Wolff v. Bethany N. Suburban Grp.*, 2021 IL App (1st) 191858, ¶ 62 (Ill. App. Ct. 1st Dist. 2021).

### A.     The Agreements are Valid and Enforceable Contracts and Tempus Performed Under the Agreements

The Agreements are supported by valid consideration and are reasonably necessary to protect Tempus's legitimate business interests, including its trade secrets and confidential and proprietary information, as well as its customer relationships. Under Illinois law, a restrictive covenant agreement "will be upheld if it contains a reasonable restraint and the agreement is supported by consideration." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011).

Prior to undertaking this reasonableness analysis, Illinois courts make two determinations. Initially, the court must find that the covenant is ancillary to either a valid transaction or a valid relationship; then, "the court must determine whether there is adequate consideration to support the covenant." *Prairie Rheumatology Assocs., S.C. v. Francis*, 24 N.E.3d 58, 62 (Ill. App. Ct. 3d Dist. 2014). Both determinations are satisfied here.

14

The first requirement is squarely met: the confidentiality, non-disclosure, and non-solicitation provisions are contained within each Defendants' respective Agreement, which they entered into at the inception of their employments with Tempus. (Ver. Compl. ¶¶ 40-42, 59-61.) *See Cumulus Radio Corp. v. Olson*, No. 15-cv-1067, 2015 U.S. Dist. LEXIS 199398, at *23 (C.D. Ill. Mar. 17, 2015) (holding the "ancillary" requirement is met where restrictive covenants are contained within an employment agreement and the employee agreed to the covenants as part their employment).

Second, adequate consideration supports the Agreements' restrictive covenants. In exchange for entering into the Agreements, Tempus employed Beyer and Paden and provided each of them access to Tempus's trade secrets and confidential and proprietary information. (Ver. Compl. ¶¶ 40, 59.) Beyer also received a grant of RSUs. (*Id.* ¶ 40.) These benefits constitute adequate consideration to support a restrictive covenant under Illinois law. *See McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1084 (Ill. App. Ct. 2015) (highlighting additional incentives are adequate consideration for a restrictive covenant).

The Agreements also satisfy the reasonableness requirement under Illinois law. A restrictive covenant is valid if "it is reasonable and necessary to protect the legitimate business interests of the employer." *Groupon, Inc. v. Shin*, No. 21-cv-6082, 2022 WL 60526, at *3 (N.D. Ill. Jan. 6, 2022). The Illinois Supreme Court has held that "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *Reliable Fire*, 965 N.E.2d at 403.

The restrictive covenants in the Agreements are reasonably related to the protection of Tempus's legitimate business interests in maintaining (1) the confidentiality of its proprietary products and technology, its pricing strategies, its customers, their historical relationship with

Tempus, and their unique preferences and pressure points, and (2) the customer relationships Tempus has invested resources, time, and sweat equity into acquiring, building, growing, and developing. The Agreements prohibit Defendants from using or disclosing Tempus's confidential and proprietary information, or from transmitting the information to a third party. (Ver. Compl. ¶¶ 41, 60.) These are legitimate business interests under Illinois law. *See Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*, No. 13-cv-02090, 2013 WL 1446425, at *3 (N.D. Ill. Apr. 9, 2013) ("There is no question that protecting confidential operational and customer information is a legitimate, protectable business interest of an employer"); *Lawson Prod., Inc. v. Morichelli*, 707 F. Supp. 3d 759, 764 (N.D. Ill. 2023) (employers have a legitimate business interest in maintaining customer relationships).

The scope of the Agreements' confidentiality, non-disclosure, and non-solicitation provisions are also reasonable and appropriate considering Defendants' roles and the nature of the information to which they had regular access. As it relates to the confidentiality and non-disclosure provisions, the Beyer Agreement does not contain a temporal or geographic restriction (Ver. Compl. ¶ 41.); the Paden Agreement has a two-year restriction as it relates to confidential and proprietary information that does not qualify as a trade secret. (*Id.* ¶ 60.) But where "trade secrets and confidential information are involved," "a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations." *Moss*, 2020 WL 1081730 at *9 (internal quotation and citation omitted). And considering Guardant and Tempus compete nationally, there is no reasonable geographic limitation which could apply. *See Moss*, 2020 WL 1081730 at *9 (finding confidentiality agreement with no durational or geographic limits reasonable).

As it pertains to the non-solicitation provisions, both Agreements prohibit Defendants from soliciting Tempus customers and prospective customers (or other business relationships) with whom they had business contact or about whom they obtained confidential information within the last twelve months of employment. (Ver. Compl. ¶ 42, 61.) These provisions are reasonable and enforceable under Illinois law. *See Lawson*, 707 F. Supp. 3d at 763 (explaining covenants that limit solicitation of specific customers are subject to a lower degree of scrutiny than a general non-competition agreement); *OptionsCity Software, Inc. v. Baumann*, No. 15-cv-5019, 2015 WL 3955622, at *4 (N.D. Ill. June 19, 2015) (finding an eighteen-month restrictive covenant was "ostensibly reasonable" as "Illinois courts uphold restrictive covenants that last for years"); *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 911 (C.D. Ill. 2015) (explaining non-solicitation provisions are reasonable where limited to customers with whom the employee had contact).

For its part, Tempus performed its obligations under the Agreements in employing Defendants and providing them with compensation, benefits, and access to Tempus's confidential and proprietary information, satisfying this element under Illinois law. *Reliable Fire*, 965 N.E.2d at 396.

### B.     Defendants Breached the Agreements

Instead of complying with their confidentiality and non-disclosure obligations, Defendants actively transmitted Tempus information on their way out the door to join Guardant. (Ver. Compl. ¶¶ 70-74, 86-90.) Three days after submitting his resignation to Tempus, Beyer sent two Tempus Excel files to his personal email address. (*Id.* ¶ 70.) One of these – "Cyd Tracking Sheets" – contains a trove of detailed and granular confidential customer information. Beyer attempted to conceal this activity by moving both emails to his "Trash" folder after sending them. (*Id.* ¶ 73.)

Beyer also physically printed additional files containing confidential customer order information before leaving Tempus. (*Id.* ¶ 77.)

Further, both Defendants uploaded numerous Tempus files to unknown web destinations via a Google Chrome Web Browser in their last days as Tempus employees. (*Id.* ¶¶ 74, 88-90.) Neither Defendant had any legitimate business reason to upload these documents. (*Id.* ¶¶ 76-77, 92.) None of these files has been returned to Tempus, nor has either Defendant assured Tempus these files have been destroyed. (*Id.* ¶¶ 80, 94.) This pattern of conduct breaches the confidentiality and non-disclosure provisions of the Agreements.

*Moss Holding Co. v. Fuller* is illustrative. There, the plaintiff moved for a TRO against two former senior sales employees claiming the former employees breached their confidentiality agreements when they sent spreadsheets containing confidential customer and supplier information to their personal email accounts and shared the information with a competitor. *Moss*, 2020 WL 1081730 at *2-4. The court found the plaintiff had a likelihood of success on its breach of contract claim. *Id.* at *9. The court further determined the plaintiff would be irreparably harmed by the defendant-employees' breach of the confidentiality agreements and issued an injunction barring the defendants from using the plaintiff's confidential information. *Id.* at *10.

Similar to the defendant-employees in *Moss*, Defendants breached their confidentiality obligations under their respective Agreements. They uploaded, printed, and/or emailed to themselves numerous files containing Tempus's confidential and proprietary information, primarily focused on customer-related information, which Guardant conceded apparently on their behalf. Defendants took this information from Tempus to benefit Tempus's direct competitor. Injunctive relief is warranted.

18

### C. Defendants' Breaches Have and Will Injure Tempus

Defendants' theft of Tempus's highly confidential information puts its customer relationships, and the significant investment Tempus put into those relationships, at risk. Beyer and Paden are now employed by a direct competitor in the same roles they held at Tempus – poised to target the same customers with whom they worked at Tempus. And Beyer has already presented Tempus information to his Guardant sales colleagues, further jeopardizing Tempus's customer relationships.

Guardant will not have to spend the time or sweat equity to gain an intimate understanding of these customers' unique preferences or to build the customer relationships, damaging Tempus and diminishing the value of this exact information. *See Garon Foods, Inc. v. Montieth*, No. 13-cv-214-JPG-PMF, 2013 WL 3338292, at *7 (S.D. Ill. July 2, 2013) (finding the plaintiff was at risk of losing business where the defendant would utilize the plaintiff's confidential information and trade secrets to the plaintiff's detriment). Accordingly, Tempus has demonstrated a substantial likelihood of success on the merits of its breach of contract claim.

### III. Tempus Is Likely to Succeed on the Merits of Its Trade Secret Misappropriation Claims Under Illinois and Federal Law

Tempus has established a strong *prima facie* case demonstrating Beyer and Paden have already misappropriated and will illegally use and disclose Tempus's trade secrets in violation of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq*., and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq*. To establish trade secret misappropriation under the ITSA, a plaintiff must show that "(1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damages the trade secret's owner." *Allied Waste Servs. Of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016). Similarly, "the DTSA creates a private cause of action in favor of the owner of a trade secret that

is misappropriated 'if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Mickey's Linen v. Fischer*, No. 17-cv-2154, 2017 WL 3970593, at *8 (N.D. Ill. Sept. 8, 2017) (quoting 18 U.S.C. § 1836(b)(1)). Both statutes provide for injunctive relief to prevent "threatened misappropriation." *See* 18 U.S.C. § 1836(b)(3); 765 ILCS 1065/3(a).

### A. Tempus's Customer Information Constitutes Trade Secrets

The highly confidential customer information Beyer and Paden used and accessed in the course of their day-to-day employment duties qualify as protectable trade secrets under Illinois and federal law. The ITSA defines a "trade secret" as:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

The definition of a trade secret under the DTSA closely tracks the ITSA's definition. *See* 18 U.S.C. § 1893(3). The Court can accordingly evaluate Tempus's actual and threatened misappropriation claims under both statutes in tandem.

As detailed herein, both Beyer's and Paden's roles were critical to Tempus's success in their territory because they were responsible for growing and developing Tempus's customer base and maintaining Tempus's strong relationships with its customers. (Ver. Compl. ¶¶ 21, 27-29, 51-53.) They were deeply familiar with Tempus's current and prospective customer identities, unique order habits and histories, and pricing structures. (*Id.* ¶¶ 32, 54.) Beyer, for his part, also worked intimately with strategic customer targets for partnerships and collaborations, and extensive exposure to internal business strategies and forecasting outlooks. (*Id.* ¶¶ 28, 36.) Both Beyer and

Paden maintained close relationships with Tempus's customers and therefore understood each customer's priorities, pressure points, goals, and patient targets. (*Id.* ¶¶ 32, 54.) Put simply, both had unfettered access to the most detailed and granular confidential customer information pertaining to Tempus's current and prospective customers in their territory, including Tempus's largest and highest revenue-producing customers. (*Id.*)

Such confidential customer information is a quintessential example of protectable trade secrets. *See, e.g.*, *Aon PLC v. Infinite Equity, Inc.*, No. 19-cv-7504, 2021 WL 4192072, at *16 (N.D. Ill. Sept. 15, 2021) (finding defendant "appears likely to succeed in proving that the identities of its highest revenue producing clients, client contacts, and client needs and preferences warrant protection as trade secrets"); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1131-32, 1134 (N.D. Ill. 2019) (assigning trade secret protection for client contact information and customer-specific information, including "pain points" and "specific solutions developed" for clients); *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (discussing the "obvious and well recognized" value of customer and potential customer contact information as well as customer-specific product preferences). Further, compilations of customer data, such as the information contained in the file titled "Cyd Tracking Sheets," constitute standalone protectable trade secrets. *See SKF USA*, *Inc*. *v*. *Bjerkness*, 636 F. Supp. 2d 696, 714 (N.D. Ill. 2009) ("[E]ven if they are just compilations of otherwise readily known facts, the compilations themselves are not available to competitors and presumably have some value by gathering the materials into one place."); *Moss*, 2020 WL 1081730 at *5–6 (finding a compilation of customer names and corresponding revenue and other requirements constituted a trade secret).

Further, in his role as CAE, Beyer was responsible for developing and implementing a comprehensive business plan for his territory, which included strategic review of Tempus's

initiatives, growth opportunities, current market weaknesses, and areas for tactical engagement. (Ver. Compl. ¶ 29.) Information regarding strategic initiatives, roadmaps, and long-term growth and forecasting outlooks also constitutes trade secrets. *See, e.g.*, *Groupon,* 2022 WL 60526, at *5 (explaining defendant former employee had access to plaintiff's trade secrets such as margins, road maps, company research, and "exposure to the inner workings" of defendant); *Inmar, Inc. v. Vargas*, No. 18-cv-2306, 2018 WL 6716701, at *3 (N.D. Ill. Dec. 21, 2018) (finding business development plans and marketing and pricing strategies constituted trade secrets).

### i. *Tempus Invests In and Protects Its Trade Secrets*

To meet its customers' highly specialized needs and thereby maintain a competitive edge in this niche marketplace, Tempus has invested more than $1.5 billion and countless hours of human effort toward developing, maintaining, and protecting its proprietary technologies, confidential information, and trade secrets. (Ver. Compl. ¶¶ 19-20.) These are hallmark indicia of protectable trade secrets. *See, e.g.*, *Inmar, Inc.*, 2018 WL 6716701, at *3 (plaintiff's confidential information constituted trade secrets where "it spent years and millions of dollars developing its knowledge of products and influencers" and "the information is not readily ascertained or generally known"); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001) (finding confidential customer data met the test "for information sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use").

Tempus also implements reasonable measures to protect the strict confidentiality of the trade secrets described herein. Tempus requires its employees to sign non-disclosure and confidentiality agreements. (Ver. Compl. ¶ 22.) It limits access to its confidential information and trade secrets to designated levels of employees depending on their duties and responsibilities. (*Id.*) And it uses multiple security systems to protect this information. For instance, all Tempus

confidential information is password-protected and requires two-factor authentication. (*Id.* ¶ 23.) Additionally, Tempus leverages multiple third-party software systems to protect the integrity of its proprietary systems and customer data. These include commercial software to manage employee accounts and authentication, monitor potential security breaches and unauthorized use of information, monitor endpoint device settings to prohibit unauthorized usage, and provide advanced threat detection and response capabilities for endpoints. (*Id.*)

Tempus also requires employees to attend trainings and affirm their commitment to Tempus's code of conduct and other core non-disclosure policies. (*Id.* ¶ 24.) And indeed, Beyer and Paden signed employment agreements with Tempus in which they promised to keep its trade secrets confidential. (*Id.* ¶¶ 41, 60.) These extensive measures are reasonable and sufficient to establish trade-secret protection under Illinois law. *See, e.g.*, *Vendavo*, 397 F. Supp. 3d at 1136 (holding plaintiff made reasonable efforts to protect its trade secrets by limiting access to sensitive areas and databases holding documents containing trade secrets, and requiring employees to sign non-disclosure agreements); *RKI*, 177 F. Supp. 2d at 874–75 (finding plaintiff had taken reasonable measures to maintain secrecy by providing access on a password-protected computer database and requiring employees to sign non-disclosure policy); *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069 (1st Dist. 2000) (finding reasonable means of protecting trade secrets included "keeping information under lock and key, limiting computer access and requiring confidentiality agreements or other efforts by the employer to advise its employees that information imparted to them must remain confidential") (internal citations omitted).

### B. The Evidence Establishes Beyer And Paden Have Already Misappropriated Trade Secrets and Strongly Indicates They Will Inevitably Disclose and Use Tempus's Trade Secrets

Tempus's Verified Complaint establishes Beyer and Paden physically took Tempus's trade secrets, as detailed *supra*. Emailing customer-related spreadsheets and physically taking

confidential information constitutes misappropriation. *See Moss*, 2020 WL 1081730 at \*6 (granting injunctive relief on misappropriation claim where defendants emailed themselves client-related spreadsheets when planning to join a competitor). This alone satisfies Tempus's burden as to the likelihood of success on its trade secrets claims.

Moreover, Illinois courts also allow trade secret misappropriation claims to proceed on an inevitable disclosure theory, which enables a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995); *accord Strata Mktg.*, 317 Ill. App. 3d at 1070 ("*PepsiCo* correctly interprets Illinois law ….".) Courts in this District have repeatedly analyzed inevitable disclosure claims under both the ITSA and DTSA, "which suggests that the doctrine is available in either context." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 n.7 (N.D. Ill. 2020) (citing cases); *see also Groupon*, 2022 WL 60526, at \*3–6 (analyzing inevitable disclosure claim under both statutes); *NAV Consulting, Inc. v. Kumawat*, No. 1:22-CV-03624, Mem. Op. & Order (Dkt. 112), at 17-18 (N.D. Ill. Mar. 31, 2023). To prevail, the plaintiff must demonstrate "that the employee 'cannot operate without inevitably disclosing the confidential information.'" *Id.* (quoting *Complete Bus. Sols., Inc. v. Mauro*, No. 01-cv-0363, 2001 WL 290196, at \*6 (N.D. Ill. Mar. 16, 2001)).

When evaluating whether the disclosure of trade secrets is inevitable, courts consider three factors: "(1) the level of competition between the former and new employer; (2) whether the employee's new position is comparable to the position he held with the former employer; and (3) the actions of the new employer to prevent the employee from using or disclosing trade secrets of the former employer." *Aon PLC*, 2021 WL 4192072, at \*18 (citation omitted). Courts afford less weight to the third factor, however, because "a complaint is not likely to contain any allegations

about what, if anything, the competitor did to safeguard the plaintiff's secrets." *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16-cv-03545, 2017 WL 1954531, at *5 (N.D. Ill. May 11, 2017).

### i. *Guardant is Tempus's Direct Competitor*

The evidence before the Court establishes Defendants' threatened misappropriation of Tempus's trade secrets under the inevitable disclosure framework. Tempus and Guardant are direct competitors in a highly specialized sector. (Ver. Compl. ¶¶ 95-100, 116.) Guardant itself identifies Tempus as one of its primary competitors in a variety of spaces and has recently engaged in an aggressive recruiting campaign to poach Tempus's sales employees. (*Id.* ¶ 98.) This directly aligns with Guardant's stated goal to grow its market share and customer base in the exact same spaces as Tempus. (*Id.* ¶ 101-102.)

### ii. *Defendants' Roles at Guardant Mirror Their Former Roles at Tempus*

Guardant hired Defendants to function in their same sales roles as they did at Tempus and in their same territories. (*Id.* ¶ 103.) Neither Guardant nor the Defendants have denied this fact. (*Id.*) Defendants will be targeting the same customers for Guardant with whom they spent years developing and growing deep relationships for Tempus. Defendants are familiar not only with the mere identities of these customers, but also the most granular information regarding their histories with Tempus, ordering preferences, pressure points, pricing structures, and priorities – all of which remain in Defendants' possession.[3] (*Id.* ¶ 32-33, 54.) Without injunctive relief, Defendants have no reason not to rely on the trade secrets Tempus spent years developing and take those customers from Tempus. Guardant should not be permitted to benefit from Defendants' duplicity. *See, e.g.,*

---

[3] Tempus is not required to give credence to any self-serving representations Guardant made on behalf of Defendants in its September 12 letter to Tempus where Defendants have refused to personally affirm the destruction of the information they took from Tempus.

*Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 284 (1st Dist. 2005) (citing *Strata Mktg.*, 317 Ill. App. 3d at 1070) ("If a former employee fulfills a substantially similar position with the plaintiff's competitor, the plaintiff has a better chance of succeeding under this [inevitable disclosure] theory.").

### iii. *Any Efforts Guardant Takes to Protect Tempus's Trade Secrets are Futile*

Guardant has represented only that it informed Defendants it expects them to honor their obligations to protect Tempus's confidential and proprietary information. This is insufficient, and, in any event, any efforts by Guardant would be futile. Given the fact Defendants are in the exact same sales roles in their same territory as when they were at Tempus, absent injunctive relief, it will be impossible for them to perform effectively without using or disclosing Tempus's trade secrets regardless of any actions Guardant takes. While Guardant may blithely instruct Defendants to "not use Tempus's information," Guardant hired Defendants fully understanding they would be performing in the same roles, working in the same territory, and targeting the same customers. The third inevitable-disclosure factor also weighs strongly in Tempus's favor.

### iv. *Defendants' Pre-Resignation Conduct Further Evidences the Inevitable Risk of Disclosure*

Defendants' conduct in their final days at Tempus contradicts any self-serving explanations they may advance to justify their conduct. Defendants knowingly and affirmatively took the Tempus information which held the most value for a competitor like Guardant. Defendants misrepresented their future plans to Tempus, and their export activity in their final days reveals a propensity to take Tempus's confidential information. Accordingly, Tempus has demonstrated a strong likelihood of success under the ITSA and DTSA. *See, e.g.*, *Mickey's Linen*, 2017 WL 3970593, at *13 (quoting *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 656-58 (7th Cir. 2006)) ("[C]ase law supports discounting [defendant's] claim that he would not or could not use or divulge

Mickey's trade secrets in the performance of his job at [new employer], given his 'history of deceit.'"); *Liebert Corp.*, 357 Ill. App. 3d at 282-83 (reversing denial of injunction on inevitable disclosure grounds where plaintiff's former employee downloaded confidential data shortly before resigning and after agreeing to work for a competitor); *RKI*, 177 F. Supp. 3d at 868, 875-77 (finding former employee would inevitably disclose plaintiff's trade secrets where he had stolen company information two days before his resignation and after accepting a nearly identical role for plaintiff's competitor).

### IV.     Tempus Will Suffer Irreparable Harm in the Absence of a TRO

Tempus has no adequate remedy at law and will continue to suffer irreparable harm as a result of Defendants' illegal conduct unless the Court issues a TRO. *See Groupon*, 2022 WL 60526, at *6 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (explaining irreparable harm is a necessary component of a request for injunctive relief).

Tempus faces substantial risk of losing customers, market share, and future opportunities due to Defendants' breaches of contract, misappropriation, and inevitable disclosure of its trade secrets and confidential and proprietary information. Guardant and Tempus fiercely compete for the same customers, each with finite spend in this space. Every relationship matters. It is difficult to quantify the harm to Tempus that will result here; however, "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury irreparable." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (internal quotation omitted); *Groupon*, 2022 WL 60526, at *6 (citing *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006)) ("Such harm cannot generally be easily quantified; and therefore, if disclosure is likely, the employer lacks an adequate remedy at law."); *Aon PLC*, 2021 WL 4192072, at *28 (finding irreparable harm in inevitable disclosure case under similar facts);

*Mickey's Linen*, 2017 WL 3970593, at *18 (holding loss of competitive position justifies preliminary injunctive relief).

### V. The Balance of Hardships Strongly Favors Tempus and The Issuance of a TRO Will Not Disserve the Public Interest

The balance of hardships also weighs in Tempus's favor given the clear and actual threat Defendants' actions pose to Tempus. Enjoining Defendants from using or disclosing Tempus's confidential and trade secret information, and from soliciting their former customers, would not harm the public interest.

In determining whether to grant a preliminary injunction, courts "weigh[] the harm of denying an injunction [to the moving party] against the harm to [the non-moving party] of granting one." *Groupon*, 2022 WL 60526 at *6. The Seventh Circuit "employs a sliding scale approach for this balancing: if a movant is more likely to win, the balance of hardships can weigh less heavily in its favor, but the less likely a movant is to win the more that balance would need to weigh in its favor." *W. Capra Consulting Grp., Inc. v. Snyder*, No. 19-cv-4188, 2019 WL 3935045, at *7 (N.D. Ill. Aug. 20, 2019) (internal citations and quotations omitted). And, "[i]n balancing the harms, the Court also considers the public interest." *Groupon*, 2022 WL 60526 at *6 (internal citation omitted).

Here, Tempus presents a strong likelihood of success on the merits of each of its breach of contract and trade secret misappropriation claims against Defendants. The balance of harms also favors Tempus. The requested injunctive relief seeks only to ensure Defendants abide by their contractual duties and their statutory duties under Illinois and federal law. Significantly, Tempus is not seeking to prevent Defendants from working for Guardant; it merely wants to protect its trade secrets, confidential and proprietary information, and customer relationships. Defendants can continue to earn a living, just not at Tempus's expense. Because the potential harm to Tempus

stemming from Defendants' breach of their confidentiality obligations and their inevitable use of Tempus's trade secret information is great and incalculable here—while the potential harm to Defendants is negligible, the balance of harms weighs in favor of injunctive relief. *See, e.g.*, *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (balance of irreparable harms weighed "heavily" in employer's favor where former employee possessed confidential information directly relevant to new position with competitor); *Mickey's Linen*, 2017 WL 3970593, at *19 (finding, in an inevitable disclosure case, that balance of harms favored plaintiff who "stands to suffer considerable non-compensable and/or uncollectable losses if an injunction were denied").

Finally, the public interest will be served by a TRO that prevents the disclosure of Tempus's proprietary information and the misappropriation of trade secrets. It is well-settled that the public interest "favors the protection of trade secret and confidential information gathered and developed by a company at significant expense." *Groupon*, 2022 WL 60526, at *7. The public interest also favors *fair* competition in markets that can be achieved without the improper use of confidential information or trade secrets to damage a close competitor's competitive edge. *See Aon PLC*, 2021 WL 4192072, at *32 (finding public interest favored injunction to prevent defendant's inevitable disclosure of plaintiff's trade secrets). Further, the public interest would be served by an injunction because Defendants still retain the right "to work [successfully] in [their] chosen field." *Mickey's Linen*, 2017 WL 3970593, at *19 (quoting *Brown & Brown, Inc. v. Ali*, 592 F. Supp. 1009, 1046 (N.D. Ill. 2009)).

All relevant factors weigh in favor of granting Tempus emergency injunctive relief. The Court should accordingly issue a TRO that enjoins Defendants from using or disclosing Tempus's confidential and proprietary information and trade secrets and from soliciting Tempus's customers,

and further set an appropriate schedule for an evidentiary hearing to determine Tempus's entitlement to a preliminary injunction in this matter.

## **CONCLUSION**

Through Tempus's Emergency Motion for Temporary Restraining Order, Tempus's contemporaneous Motion for Expedited Discovery, and Tempus's Verified Complaint, Tempus respectfully asks this Court: (i) to permit the parties to engage in limited expedited discovery prior to a preliminary injunction hearing; (ii) to schedule this matter for preliminary injunction hearing as soon as its schedule permits following a period of expedited discovery; (iii) upon completion of the hearing, to enter a preliminary injunction enjoining Defendants from disclosing or using Tempus's confidential, proprietary and trade secret information; and (iv) upon completion of the hearing, to enter a preliminary injunction enjoining Defendants from violating the Non-Solicitation provisions of their respective Agreements.

Dated: September 18, 2024

Respectfully submitted,

TEMPUS AI, INC.

By: /s/ *Mikela T. Sutrina*
            One of Its Attorneys

Mikela T. Sutrina (6311408)
Thomas V. Panoff (6283695 )
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 N. Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (313) 499-6301
msutrina@sheppardmullin.com
tpanoff@sheppardmullin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2024, I sent copies of the foregoing document via e-mail and U.S. mail, postage prepaid, to Defendants at the following addresses and e-mail addresses:

> *Sean Beyer*
> *7508 W Shining Amber Lane*
> *Tucson, AZ 85743*
> *drsbeyer@yahoo.com*
>
> *Cydney Paden*
> *1765 W 66th Ave.*
> *Denver, CO 80221*
> *Cydney.Paden@gmail.com*

/s/*Mikela T. Sutrina*
One of the Attorneys for Plaintiff